114 N.J. Super. 584 (1971)
277 A.2d 566
IN THE MATTER OF THE ADOPTION OF A CHILD BY P, AND WIFE.
Superior Court of New Jersey, Appellate Division.
Argued April 5, 1971.
Decided May 19, 1971.
*586 Before Judges GOLDMANN, LEONARD and FRITZ.
Mr. Edward Terner argued the cause for appellants.
Mr. Roger S. Clapp argued the cause for respondents (Messrs. Clapp & Eisenberg, attorneys; Mr. Paul I. Auerbach, pro hac vice, of counsel).
The opinion of the court was delivered by GOLDMANN, P.J.A.D.
Plaintiffs P brought a County Court (Probate Division) action seeking adoption of L, the infant girl born out of wedlock to N. The application was contested by N and the natural father, W, whom N had subsequently married. Following the taking of testimony the trial judge filed an opinion in which he concluded that the child's interests would best be served by returning her to her natural parents. Plaintiffs then moved for a new trial or for permission to introduce additional testimony and to reargue the issues. The motion was denied and judgment entered in favor of the natural parents, transfer of custody from plaintiffs *587 being stayed provided they promptly filed notice of appeal. They did so, challenging both the judgment and the denial of their motion.
The child was born March 28, 1969. The mother, then almost 22, freely and understandingly relinquished all parental rights four days later, specifically giving L into the custody of plaintiffs. Upon the filing of their complaint for adoption, dated April 18, 1969, the county judge entered an order making the baby a ward of the court, directing the Bureau of Children's Services to conduct an investigation and file a written report concerning the status of the natural parents as well as plaintiffs' fitness to adopt the child and provide her with a suitable home, and fixing July 8, 1969 as the date for a preliminary hearing in accordance with the statute, notice of the hearing to be served upon the mother personally.
On June 11, 1969, after the Connecticut Welfare Department had written N about the adoption (Connecticut was her home state), N wrote the following "To Whom It May Concern" letter:
My feelings about the adoption have changed. I would like to stop the proceedings. I have thought a lot about it for the last two months, and I want the baby back. The father and I plan to be married this year, and want our child with us.
The natural father, W, was married at the time of the conception and birth of the child. On July 4, 1969 he obtained a Mexican divorce from his wife, Frances. Two days later he married N in a civil ceremony, and on August 9, 1969 they exchanged church vows.
Meanwhile, the hearing originally scheduled for July 8 was postponed to December 4 and continued on December 12 and 22. The judge filed his opinion on February 13, and entered judgment on March 25, 1970.
Plaintiffs first argue that R. 1:21-2, providing for the pro hac vice admission of out-of-state attorneys, was violated in that a brief sent to the trial judge by the natural parents' *588 New York trial counsel was not signed by a New Jersey attorney. The brief (designated as "Final Argument and Summation") was filed by permission of the trial judge as a substitute for oral argument. That aside, the cited rule could be relaxed under R. 1:1-2. In any event, plaintiffs can show no prejudice. The argument is frivolous.
Equally so is plaintiffs' second contention that the proceedings were defective because the trial judge failed to order a pretrial hearing and enter a pretrial order, as required by R. 4:25-1. The point is raised as plain error, no objection to the alleged deficiency having been raised. As a matter of fact, counsel had on July 8, 1969, the date fixed for the preliminary hearing, discussed the issues involved at an unreported side-bar conference. Again, the rule in question may be relaxed, and there is no showing of prejudice. The point made is without merit.
Plaintiffs next argue that the trial judge's opinion fails to include findings of fact and conclusions of law, as required by R. 1:7-4. This contention is patently without substance, as a reading of the opinion readily shows.
Plaintiffs' first significant contention is that the trial judge erred in denying their motion for a new trial or for permission to introduce additional testimony and to reargue the issues. The argument made in opposition is that what plaintiffs sought to adduce would have added nothing to the case, being merely cumulative and repetitious. We cannot agree.
As noted, the April 22, 1969 order for preliminary hearing, among other things, directed the Bureau of Children's Services to make an investigation and written report concerning the status of the child's parents. The Bureau filed a report, apparently before June 1, 1969. It dealt in some detail with the child, the circumstances of her placement, and plaintiffs as prospective adopting parents. However, it contained nothing about the natural parents beyond the fact that a request had been made of the welfare agency in Danbury, Connecticut, to obtain a social history of the natural mother, *589 who currently resided there, and of the putative father. Nothing more was heard until the Connecticut Commissioner of Welfare sent a report to the New Jersey Bureau of Children's Services on January 9, 1970. That report detailed an interview the social worker had had with the natural parents, then married, at their home in Pawling, N.Y. Although it contained considerable biographic detail, it provided little insight into the character and personality of the natural father or the quality of the marital relation. The report was obviously based upon what the couple had told the social worker.
The Connecticut report was filed with the clerk of the trial court on January 15. A copy was not forwarded to plaintiffs or their attorney, and they had no notice of it until after the trial judge filed his opinion on February 13  this despite the fact that at the conclusion of the December 1969 hearings the judge had said it was his understanding that a report would shortly be submitted with respect to the natural parents and that "[Plaintiffs] may want to examine that report. You may also want to cross-examine with respect to it by the person who prepared it [sic]." Plaintiffs never had an opportunity to do so.
It is not so that plaintiffs could have at the hearings produced the proofs for which they unsuccessfully argued on their motion. They did not receive a copy of the Connecticut report until February 28, after briefs had been filed and the court's decision rendered. The facts stated in the report and those brought out at trial called for further investigation. Such an investigation could not reasonably have been made before the matter was decided because plaintiffs did not know the identity of W's first wife, Frances, and so found it impossible to get in touch with her. There had been difficulty in tracing her because of an incorrect address. As might be expected, W had effectively prevented Mrs. P. from communicating with his new wife, N. It now appears that the first wife, Frances, had information which threw an important light upon the character and conduct of W. It was, of course, impossible for plaintiffs to have earlier communicated *590 with the Connecticut social worker who investigated the circumstances of the natural parents.
Since the policy which absolutely controls an adoption proceeding is what is in the best interests of the child, a judge should lend every effort to make certain he has all pertinent evidence relating to the parties involved. We are satisfied that the trial judge did not have the entire story in this case, certainly as concerns the natural father.
This much we now know about W. He grew up in the home of his paternal grandparents, where his father also resided after his wife left him when the boy was seven. W attended high school and obtained his diploma while in the Naval Reserve, from which he was discharged in September 1969. He had married Frances in November 1964. Their first child was born four months later, in March 1965. It appears that W left Frances in October 1965 and thereafter pretty much ignored her and the child. While on leave in January 1968 he allegedly sought a "reconciliation" with Frances, spent one night with her, and then departed, leaving her pregnant. The second child was born in September 1968. That child has been of little concern to him.
Meanwhile, when W left Frances in October 1965 he took up with N, who was then 18. He returned to N in 1968 and, at a time when Frances was carrying the child conceived in the one-night "reconciliation," impregnated N, presumably in June 1968.
Enough has been mentioned to have called for a more searching investigation into W's character, the true story of the first marriage, the attention and support he may or may not have given his first wife and the children he had by her, and the existing marital situation involving N. As to the latter, we do know from his testimony that in their first year of marriage they have had fights and arguments about "everything possible."
We conclude that the evidence plaintiffs offered to obtain and produce was material to any determination of *591 what was in the best interests of the child; that it could not reasonably have previously been obtained, and that it might well have changed the result.
We observe, in passing, that the order denying plaintiffs' motion is unenlightening in its terseness. Although there is no rule requiring that findings be made on such a motion, it would have been helpful to have some indication of why the trial judge turned plaintiffs' application aside.
All this having been said, we nonetheless see no need for further testimony because we are of the opinion that the child should not have been ordered returned to the natural parents.
The announced purpose of our Adoption Act, N.J.S.A. 9:3-17 et seq., is to promote policies and procedures socially necessary and desirable for the protection not only of the child placed for adoption and its natural parents, but also the adopting parents. To that end the statute declares it necessary and desirable "to protect the child from unnecessary separation from his natural parents, from adoption by persons unfit for such responsibility, and from interference by his natural parents after he has been established in an adoptive home * * *." N.J.S.A. 9:3-17(a), emphasis supplied.
The primary concern of our courts in adoption cases has always been what is best for the child. Although initially a natural parent has the right to custody, that right is secondary to the concern of the State, as parens patriae, in promoting the child's welfare and best interests. In re B, 63 N.J. Super. 98, 104 (App. Div. 1960); Lavigne v. Family and Children's Society of Elizabeth, 11 N.J. 473, 479-480 (1953) (quoting with approval from Richards v. Collins, 45 N.J. Eq. 283, 287 (E. & A. 1889)).
The severance of natural ties is of such obvious finality as to call for the exercise of caution. In re N, 96 N.J. Super. 415, 423 (1967). However, where the natural parent (here, the mother) voluntarily, freely and understandingly gives consent, with a present resolution to abandon *592 parental rights, that consent should be considered irrevocable and binding, absent fraud or some overriding equitable consideration, and assuming that such a result is not inimical to the welfare of the child. To hold otherwise would permit the natural parent, by merely indicating a changed attitude toward parental duty and obligations, to withdraw such consent and have the child returned. See In re D, 78 N.J. Super. 117, 126 (Cty. Ct. 1963).
The mother in this case had the fullest opportunity to consider the course she finally followed. She had discussed the matter with her mother, her obstetrician and a New York judge, as well as two social agencies, and then reached a firm decision to let her baby go immediately after birth. She was under no pressure from anyone; quite simply, she had concluded there was no hope of W divorcing his wife and marrying her. She now says that she was in a post-partum depression, but there is no persuasive evidence in support of this claim, either from the attending doctor or anyone else.
N changed her mind some two months after giving up the baby, when she learned that W had found a way of divorcing his wife by resorting to the Mexican courts. The road to his marrying her now appeared open, and so she entered her protest to the adoption proceedings. That she had been mistaken as to the possibility of W marrying her should not defeat the binding quality of the consent she gave. A mistake as to a future event is not of such nature as will vitiate an otherwise valid consent. Nealon v. Farris, 131 S.W.2d 858 (Mo. Ct. App. 1939); Nelson v. Nelson, 127 Ill. App. 422 (App. Ct. 1906). Cf. Bauer v. Griffin, 104 N.J. Super. 530 (Law Div. 1969), aff'd 108 N.J. Super. 414 (App. Div. 1970), certif. den. 56 N.J. 245 (1970).
The trial judge found, in effect, that plaintiffs were good people who could furnish a fine home for the child; further, that the natural parents, except for premarital indiscretions, were morally fit and could provide a good home. Our impression is that since he did not find plaintiffs to be obviously *593 better people, and the natural parents relatively less fit to raise the child, he chose to preserve the natural link as being in the child's best interests, restoring to the mother (and W) "her own flesh and blood."
The trial judge passed over the testimony of the pediatrician and child psychologist whom plaintiffs presented as witnesses. Both testified as to the traumatic shock a very young child can experience when separated from the only mother it has ever known, and handed over to another woman, albeit the natural mother, with whom it has had no real identification. Courts have in recent years begun to pay some attention to accordant findings of child study specialists. In In re Jacques, 48 N.J. Super. 523 (Ch. Div. 1958), the court, in passing, said:
An infant begins to feel that this world is a good place through the faces he begins to recognize. These faces need not be those of his natural father and mother. He only knows that they are the ones who comfort him and brush away his fears and tears and in whom he places his love and trust. To destroy this trust would result in a feeling of rejection just at a time when his outlook on life is being formed. * * * [at 533]
Everything in the record points to the fact that the child was well adjusted and receiving every attention at plaintiffs' hands. A host of friends and neighbors testified to the deep-rooted love and affection the baby showed the adopting parents.
Eleanor Nagy, a child psychologist, testified that she had visited plaintiffs' home to examine the child a month before, when it was 31 weeks old. Her testing indicated that the child was within the average range of recognized intelligence and behavior scales and that she was developing in an optimum manner, indicative of the type of care and attention she was receiving. Miss Nagy testified that between the ages of three and five months a child begins to form a "focus relationship" with the mother; in the next six months or so there follows a period of what is known as "stranger anxiety." If a child is separated from its mother during the latter *594 period, the experience can be traumatic and upsetting; indeed, it has been found to be fairly dangerous to separate within that period. She explained that a child learns to develop a sense of trust in the early months, but if that sense is shaken, there are times when a child never really goes back to developing it, to cementing this feeling of trust, and the child grows up to be anxious and insecure. There is the possibility of permanent damage, she said, if a child is separated during the indicated period of time, depending upon the type of environment it goes into. Even going from one good environment to another could have an adverse effect.
Dr. Mancusi Ungaro, the baby's pediatrician, testified that the child was normal, well adjusted and receiving every attention and affection. He said there would be a certain amount of psychiatric trauma to an infant removed from a home in which it was nurtured and cared for, and this would be so here. He, too, testified that an infant shortly after birth recognizes his keeper  the mother who feeds, nurtures and caresses him. At first the child does this through sound, feeling and smell, but shortly he begins to see and focus his attention on the mother. The bond formed would be one that would be difficult to break.
The emphasis in the trial judge's resolution of an admittedly difficult problem was upon biological parenthood rather than what has been termed psychological parenthood, i.e., the mutual interaction between adult and child described in such terms as love, attention, basic trust and confidence, considered essential for the child's successful development. See Note, "Alternatives to `Parental Right' in Child Custody Disputes Involving Third Parties," 73 Yale L.J. 152, 158 et seq. (1963), where the writer cites outstanding authorities for the conclusion that
* * * After a period of separation from the biological parent and care by a third party, the child may learn to look upon the latter as his biological parent; any prior relationship with the biological parent may deteriorate to the point where it is not only supplanted but also incapable of resuscitation. Where this has happened, the change *595 in custody based solely on biological relationship might, by disrupting the existing relationship of psychological parenthood, work considerable emotional harm upon the child. * * * [at 158]
The trauma of separating a child from the custody of an adult with whom an affection-relationship exists "may be psychologically equivalent in its detriment to the orphaning of that child. While, in all probability, the child would eventually form a new affection-relationship, this tie may be of lesser quality and strength" (at 161).
Although it is not the fault of the mother that two years have passed since she turned the child over to plaintiffs, the fact remains that it is only because she made a positive determination to give her child away that the problem before us developed. Even in the first few months before she suddenly changed her mind, the child had already begun to form the focus relationship of which child psychologists speak  a psychological relationship which had strengthened and deepened by the time the matter came on for hearing in December 1969. Had we been called upon to decide the issue at that time, we would not have transferred custody back to the natural parents, and this out of consideration for what is basically and truly the best interest of the child. We certainly cannot in good conscience do so now.
Reversed and remanded for the entry of a judgment in accordance with our opinion.