139 N.J. Super. 533 (1976)
354 A.2d 662
IN RE ADOPTION OF J BY J AND A.
Superior Court of New Jersey, Appellate Division.
Argued September 29, 1975.
Decided February 24, 1976.
*535 Before Judges CARTON, CRAHAY and HANDLER.
Mr. Aaron Dines argued the cause for appellant (Messrs. Lordi, Imperial & Dines, attorneys).
Mr. Philip J. Mylod argued the cause for respondent.
The opinion of the court was delivered by HANDLER, J.A.D.
In this most unusual adoption case, one parent murdered the other. The overriding issue created by this occurrence is whether the natural father as the guilty parent had thereby forsaken his parental obligations to the child of the marriage and thus forfeited his legal rights as parent under the adoption statute.
On November 25, 1973 the maternal grandparents of the child, J, filed an adoption complaint in the Probate Division of the Essex County Court. The natural father and his parents answered on February 14, 1974, opposing the adoption. A counterclaim was also filed for custody of the child in the father upon his release from prison, for placement of the child in a neutral foster home until the father's release, and for visitation rights for the paternal grandparents. The counterclaim was later dismissed and a consent order was entered permitting the paternal grandparents and certain other relatives of the child visitation rights.
On December 20, 1973, the trial judge entered an order making the child a ward of the court and fixed a date for a *536 preliminary and final hearing. On October 10 and 11, 1974 a hearing was held, and on October 24, 1974 a written opinion was delivered. On December 3, 1974 judgment was issued dismissing the complaint, "said dismissal being only on the record presently before the Court and without prejudice * * *." Entry of judgment was stayed pending application by the maternal grandparents for appointment as guardians of the child. On January 20, 1975 such an order was entered, consented to by counsel for the father and the paternal grandparents. The father's right to apply for the custody of his daughter or for visitation rights was reserved pending his release from prison. On January 8, 1975 plaintiffs filed notice of appeal from the decision and order dismissing their complaint.
J, the child, was born in June 1970. Her mother, D, was two months pregnant with J when D and J's father, F, were married. The marriage was not a particularly stable one. F worked on and off as a motorcycle and automobile mechanic. D remained at home, taking care of the child. The couple at various times lived in their own apartment, in the home of D's parents, and at a summer home owned by F's parents. Money was a constant problem.
In September 1972, F and D separated. In November D filed a complaint for desertion and nonsupport. F agreed to pay $35 weekly support, but by May 1973 was in arrears. Although F and D never again maintained a common residence after the September 1972 separation, they saw each other frequently and maintained a sexual relationship.
In early 1973 D filed a complaint for assault and battery against her husband. The complaint related to an incident where F broke down a door to D's apartment and flicked a lit cigarette at her. The matter was adjusted in the Belleville Municipal Court and, at the judge's suggestion, the couple saw a marriage counselor several times.
Matters came to a tragic pass in the early morning hours of May 24, 1973. F believed that D had been unfaithful to him. He went to her apartment and after some discussion, *537 which did not satisfy him, he stabbed her with a kitchen knife, causing her death. F himself called the police and an ambulance. The same morning J's maternal grandparents came for the child, who has remained with them ever since.
F entered a plea of non vult to a charge of murder and was sentenced to an indeterminate to ten-year term at the Youth Reception and Correction Center, Yardville. He is currently serving that sentence.
No one disputes the fact that plaintiffs have provided a secure, comfortable and loving home for J. Neither is it disputed that plaintiffs would make excellent adoptive parents. Testimony was unrebutted that plaintiffs had become the "psychological parents" of J and that any significant interruption in their relationship would be severely, and possibly permanently, damaging to J.
There was also testimony from plaintiffs' psychologist that he had evaluated F and found, because of personality disorders, F would not be an acceptable parent figure or a good parent.
On behalf of F there was testimony that he had been in frequent contact with his daughter during the separation period; that he had purchased presents for her and had sporadically given D money for her own and J's support. There was testimony from a lifetime friend of F that he had always been deeply concerned for the welfare of his wife and daughter. Other witnesses testified that F was deeply remorseful over his act, that he had adapted to Yardville extremely well, was earning college credits, had set goals for himself, was in a satisfactory treatment program, and was, by and large, straightening himself out. Since the hearing F has had weekend furloughs from prison.
The trial judge, in his written opinion, found the following as facts: (1) that F had not forsaken his parental obligations prior to the killing; (2) that he had done everything possible after D's slaying to help J, including assisting getting social security benefits to her; (3) that F's failure to *538 object initially to J going to plaintiffs was not abandonment of J "any more than any other father's permitting a natural mother keeping custody of small children upon a separation where he maintains visitation rights."
Plaintiffs understandably have stressed throughout the proceedings that the vital interests of the child demand literally that she be adopted by her maternal grandparents. Although not so phrased, it is urged vigorously that the paramount or dominant criterion for adoption, in this particular case, should be the welfare of the child and, in this unique and special situation, the statutory standard of "forsaken parental obligations" on the part of the nonconsenting natural parent should at most be a consideration ancillary or subordinate to the good of the child.
New Jersey's adoption act directs a court, in an adoption matter, to conduct a preliminary hearing into (1) the circumstances under which the child came into plaintiffs' home; (2) the status of the child's natural parent(s); (3) the child's fitness for adoption; and (4) plaintiffs' fitness to adopt the child. N.J.S.A. 9:3-24A. At the close of the preliminary hearing, the court may declare that a natural parent has no further right to custody of the child if that parent
* * * is dead, or mentally incompetent, or has forsaken parental obligations or has been divorced by the other parent on grounds of adultery or desertion or extreme cruelty * * *. [N.J.S.A. 9:3-24C; emphasis added].
Where the court has concluded at the preliminary hearing that the parent of the child should have no further parental claim over the child, the adoption process may proceed to finality. N.J.S.A. 9:3-25.
It is firmly settled that the adoption of a child may not be accomplished over the objection of a natural parent unless it has been established that the objector's rights as a parent should be terminated because of a disability or parental offense as specified by statute. The welfare of the child cannot *539 become a moving consideration for adoption unless the protesting parent has forfeited his rights qua parent by engaging in conduct prohibited by the statute.
In In re D, 61 N.J. 89 (1972), the court stated:
[T]he best interests of the child cannot validly ground a judgment of adoption without it first having been determined that the parental rights of the non-consenting parent can and should be terminated. [at 95]
In In re Adoption by R.D., 127 N.J. Super. 311 (App. Div.), certif. den. 65 N.J. 292 (1974), this court was faced with an argument similar to that made here, viz, that the best interests of the child control in adoption proceedings. While noting that In re D, supra, dealt with adoption following divorce, the court saw no reason to confine the D holding to its factual boundaries. It said:
* * * considerations of natural justice would seem to militate against a construction of the statute which could deprive a natural parent of [his] child without the showing of an abandonment or forsaking of the child by that parent, regardless of whether the child would be better off with others. [127 N.J. Super. at 315]
The trial judge in this case recognized, and properly so, that the prerequisite for adoption is the forsaking or repudiation of parental obligations by the nonconsenting parents; and that this must be established as a precondition without regard to whether the child would have a happier and healthier life with others. Consequently, the crux of the litigation is whether by his conduct the natural father, F, had abandoned or forsaken his parental obligations.
The statute N.J.S.A. 9:13-18(d) in rather strong definitional terms gives this meaning to the phrase "forsaken parental obligations," viz "willful and continuous neglect or failure to perform the natural and regular obligations of care and support of a child." The trial judge narrowed the inquiry to whether F had forsaken his parental obligations prior to or subsequent to his commitment to Yardville. Focusing *540 upon the period of time prior to F's imprisonment, he found from the evidence that the father visited his wife not only to see her and be with her during their separation but also to visit his daughter. There was evidence that F made some monetary contributions from his earnings and unemployment benefits. Moreover, he did not express an intention to abandon his daughter. Thus, the judge determined that before F's commitment he had not abandoned his child or forsaken his obligations to her as a parent.
The judge also concluded that F had not forsaken his parental obligations subsequent to his imprisonment. He stated: "Within the limits imposed upon F since May 1973, he has expressed concern about J and did cooperate to get [social security] benefits for her. There is little more he could have done after May 1973." And further, "since May 1973, there is no evidence of a settled purpose by F to forsake his parental obligations towards J." Because the judge sat without a jury, his conclusion that F had not forsaken his parental obligations prior or subsequent to his incarceration must be permitted to stand since these findings were based on sufficient credible evidence. See State v. Johnson, 42 N.J. 146, 162 (1964).
The trial judge in his opinion gave scant treatment to the killing itself. As noted, the issue framed by the judge was whether there had been a forsaking of parental obligations before or after F's imprisonment. In thus constricting the focus of the hearing, the judge purportedly applied an observation in In re D., supra, that "a criminal record alone is not sufficient to cut off parental rights." 61 N.J. at 97. That case, however, does not suggest that the underlying crime which gives rise to a criminal record or imprisonment may not be extremely relevant in a determination of parental privilege in an adoption proceeding. It may be that many courts are reluctant to consider a parent's criminal record or imprisonment, without more, as an "abandonment" of a child. Annotation, "Adoption  Abandoned or Deserted *541 Child," 35 A.L.R.2d 662, 693. Nevertheless, in a given case it may be entirely fitting that an individual's criminal background and behavior, as well as his criminal record and incarceration, should disqualify him as a parent. E.g., Hutson v. Haggard, 475 S.W.2d 330 (Tex. Civ. App. 1971).
The judge in the present case did not, it seems, appreciate sufficiently that F had not merely acquired a criminal record but had been incarcerated for a grave crime. Virtually no thought was given to the nature of the crime itself  the reasons for F's imprisonment  and the impact of the crime upon the child. If the crime committed by a parent results in a conviction and is itself palpably hurtful to the child, then the commission of the crime should be a potent, if not determinative, factor in the evaluation of whether by that conduct the parent has forsaken his parental obligations. In re D., supra, does not impel a different approach or result. We thus disagree with In re Rigg's Adoption, 10 Misc.2d 617, 175 N.Y.S.2d 388 (Sup. Ct. 1958), cited by the trial judge. There it was held that a father convicted of manslaughter for the death of the child's mother had not abandoned the child, as required under the New York statute. No consideration was given by that court as to the circumstances of the killing and its effect upon the child. Nor do we regard In re Adoption of S.E.D., 324 A.2d 200 (D.C. Ct. App. 1974) as germane authority since the court ruled that the father who had been imprisoned for murdering the child's mother had in fact consented to the adoption.
With respect to the actual murder committed by F, the trial judge characterized the killing as "impulsive." He found that when F learned that D, on the weekend before the fatal event, had gone to the shore with J and was there with another man, this was a circumstance which "would provoke an individual with a personality such as F had at the time." Thus, to the extent the homicide was considered it is apparent that the judge did not believe the act of murder *542 committed by F constituted a forsaking of parental obligations within the meaning of the statute.
We reverse on this ground and hold that under the particular circumstances of this case the murder of the child's mother by the father was a willful act resulting in a profound and permanent injury to the child, the loss of her mother. In the circumstances here present the crime committed by the natural father constitutes a forsaking of his parental obligations under the adoption statute, requiring the termination of parental rights to the child.
Our view of the homicide is not really at variance with that of the trial judge. There was introduced into the record the entire file of the prosecutor, several psychiatric reports and the presentence investigation report. These exhibits document the circumstances of the killing. Preceding the fatal assault it is clear that F was upset with his wife. While there was no showing of a homicidal intent when he came to discuss with D her trip to the shore with another man, one of her neighbors, F was nevertheless emotionally keyed up and agitated. He was unable to elicit any answers from her which satisfied him or allayed his jealousy. When he lay in bed beside her, she was unresponsive. F then went to the kitchen, spied a knife in the sink and returned to the bedroom; while she was still supine, he plunged the knife into her chest. The killing itself was brutal, evidenced by the grisly aftermath; D was stabbed not once but several times, the victim's torso bearing knife wounds front and back. While she was initially stabbed in bed, she ultimately collapsed in the front hallway of the apartment. Moreover, the child was present in the apartment, possibly an actual witness to the slaying of her mother.
It is also established by the evidence that while F's act was impulsive and not premeditated, he was not legally insane at the time of the killing. We do note the opinion of a psychologist offered by F at the hearing, to the effect that F was temporarily insane, suffering from schizophrenia "at the *543 moment of killing." The trial judge, however, did not so find, nor was this opinion in any way singled out by him. Indeed, the judge's finding that the killing was "impulsive" is consistent with that contained in the report of a psychiatrist based upon an examination of F in May 1973. This report, introduced in evidence, had been made available to the prosecutor, the probation department and the sentencing judge. The psychiatrist there found that F had a personality disorder and depressive neurosis, as well as some drug and alcohol involvement; there was, however, no finding that F was suffering from a mental disease. The psychiatrist concluded that F was not insane at the time of the killing and that he was able to understand the nature and quality of his behavior and differentiate right from wrong.
There can be little question that F's act of killing the child's mother was intentional and volitional. The homicide was a willful act, although triggered by frustration, jealousy and anger. We are satisfied, therefore, that insofar as the legislative standard of a forsaking of parental obligations under the adoption statute, N.J.S.A. 9:3-18(d), entails willful conduct, the act of murder committed by F must be so considered.
The adoption statute, as pointed out, also requires a failure of parental duty. The murder by the father of the mother was a parental offense of the greatest enormity, the very antithesis of a parent's duty "of care and support of a child" required by the adoption statute to be honored in order to avoid a forfeiture of parental privilege. That the father may have professed to feel love and affection for his daughter does not lighten her affliction or diminish the damage visited upon her. Cf. In re Jacques, 48 N.J. Super. 523, 531 (Ch. Div. 1958).
It is not amiss to emphasize that, while we are constrained to sustain the judge's finding that there had been no actual forsaking of parental obligations by F prior to the killing, his behavior toward his wife and child during that time *544 was irresponsible, erratic and remiss. In this case the heinous crime he committed was preceded and colored to a great extent by a desultory and ineffectual fulfillment of paternal responsibilities. Thus, in these circumstances the actual and purposeful conduct of the parent and its irreparable effects upon the child  not the parent's amorphous concern for his child  are paramount in assessing parental privilege. Cf. In re Adoption by R.D., supra; D.M. v. State, 515 P.2d 1234, 1236-1237 (Alaska Sup. Ct. 1973); In re P, 114 N.J. Super. 584, 593-595 (App. Div. 1971); Winans v. Luppie, 47 N.J. Eq. 302, 304-306 (E. & A. 1890).
It is painfully plain that the father's killing of the mother forever deprives the child of her maternal presence and being  the essence of childhood. A more horrendous wrong to a child is difficult to conceive. In Small v. Rockfeld, 66 N.J. 231 (1974), our Supreme Court was concerned with whether a father, who was alleged to have wrongfully killed his wife, the child's mother, was immune from suit on behalf of the child. The court ruled the killing of the child's mother was a grave parental offense and that a child was entitled to bring an action under the Wrongful Death Act, N.J.S.A. 2A:31-1 et seq. Significantly, the court in that case reiterated an insight of Henderson v. Henderson, 14 Fla. Supp. 181 (Cty. Ct. Rec. 1958), viz:
It is generally a wholesome rule to grant immunity from intentional or negligent personal torts which occur within the scope of domestic relations. The security, peace and tranquility of the home by the very foundation upon which our society rests, must be protected. But where one parent deliberately and willfully shoots and kills the other parent as alleged in this complaint thereby not only breaking up the family unit but also depriving the child of the support, care, guidance, comfort and companionship of the other parent, he forfeits all claim to immunity. [at 185]
Assuredly, when one member of a family is wronged by another, the entire family, individually as well as collectively, suffers. Cf. U.S. v. Allery, 526 F.2d 1362, 44 U.S.L.W. 2291 (8 Cir.1975).
*545 Parallel reasoning convinces us that in the context of an adoption proceeding the parental relationship requires that primary emphasis be directed objectively, not so much toward the real or imagined feelings of the parent for the child, but to the responsibilities owed the child and the actual manner in which they have been discharged. D.M. v. State, supra at 1237. Here, it is too clear that the inexorable end result of F's criminal act, the slaying of D, is the tragic and enduring loss to J of her mother. It is especially grievous since the child is of tender years, at an age when the loss and absence of her mother are bound to be felt most acutely. We conclude therefore the willful and unmitigated act of killing by one parent of the other is totally inconsistent with and utterly repugnant to the accepted duties owed a child by a parent. That conduct, in these circumstances, we rule, falls within the legislative understanding of a failure to uphold the regular and natural obligations of care and support for a child as a constituent element of forsaken parental obligation under N.J.S.A. 9:3-18(d).
The statutory definition of "forsaken parental obligations" also imports the primary notion that the neglectful or wrongful conduct of the offending parent not only be willful and detrimental to the child but also continuous or lasting in nature. N.J.S.A. 9:3-18(d); cf. In re N., 96 N.J. Super. 415 (App. Div. 1967). If parental conduct necessarily and inevitably causes a permanent deprivation of a mother's care, nurture and support for the child, that conduct can be understood to be a continuous failure of performance of parental obligations on the part of the derelict parent. Even though the act of killing itself may be abrupt, its ruinous consequences for the child are everlasting and irreversible.
Thus, where as here, the parental offense is the willful slaying of the other parent resulting in a devastating maternal loss to a child of tender years, such conduct constitutes *546 the willful and continuous failure to perform the regular obligations owed a child by the offending parent within the intent of the adoption statute.
In so ruling, it may be noted that we do not here deal with other circumstances wherein it might be claimed that the willful slaying of one parent by the other would not compel the termination of parental rights. Background circumstances revealed by this record are, as mentioned, a pattern of neglect and inattention on F's part with respect to the needs of his very young daughter, albeit that course of intermittent neglect was not of a magnitude to justify, in and of itself, the termination of parental rights. Additionally, though not highlighted, expert testimony cast serious doubt that F, for all of his good intentions, had the psychological equipment required of a parent. We emphasize, again, that such factors, standing alone, would not have compelled the termination of parental rights. When these existing failings, however, were capped by the willful murder of the child's mother, the forsaking of parental obligations was complete.
We conclude, therefore, upon this record that the natural father did forsake his parental obligations in the killing of the child's mother and that his parental rights to his child should for that reason be terminated. Accordingly, the decision below is reversed. Since the record supports the conclusion that the adoptive parents and the child are otherwise fit for adoption and the proceedings embraced both the final as well as preliminary hearing under the statute, the trial judge is directed to enter a judgment of adoption in favor of plaintiffs.
CRAHAY, J.A.D. (dissenting).
The majority orders an adoption in this case on the ground that the objecting natural parent has forsaken his parental obligations. After finding that there was sufficient credible evidence to support *547 the trial judge's holding that F had not, at any time, forsaken those obligations, it concludes that
* * * the willful and unmitigated act of killing by one parent of the other is totally inconsistent with and utterly repugnant to the accepted duties owed a child by a parent.
and
* * * where as here, the parental offense is the willful slaying of the other parent resulting in a devastating maternal loss to a child of tender years, such conduct constitutes the willful and continuous failure to perform the regular obligations owed a child by the offending parent within the intent of the adoption statute.
There appears to be no precedent for this holding. However heinous the act of slaying may have been and however destructive of the family unit, it does not follow, in my view, that it constitutes a failure to perform parental obligations, after the criminal act, willfully and continuously, as the statute requires, so as to allow the irrevocable cessation of all parental rights. Hypothetically, if the majority view governed, a good, loving and providing parent would lose every attribute of parenthood if, in a rage, he or she feloniously slew the other parent  possibly a non-caring and non-loving ne'er-do-well. Could it be said that during incarceration for the crime, and regardless of that parent's continued solicitude for surviving children, there was a continuous and willful abandonment of them, so as not to hear such a criminal offender's objection to adoption by others? The Legislature has chosen not to make any criminal offense the basis for such an estoppel. I do not think that we should make the crimes of murder and voluntary manslaughter (if the majority includes the latter), however heinous or revolting, a judicial enlargement of the statute. I, of course, do not mean to say that a parent's history of criminality and incarceration might never be such as to support a finding of abandonment of parental obligations.
I view the majority holding to be an unwarranted exception to the holding of In re D, 61 N.J. 89 (1972), which *548 instructs that adoption, allowing for no future change, differs from an award of custody, which is impermanent and may be changed as circumstances require. A child's relationship with a parent is of such moment that all doubts are to be resolved against its destruction. See also, In re N, 96 N.J. Super. 415 (App. Div. 1967).
In this matter J's best interests are presently being served by the order giving her custody to plaintiffs as guardians. One may presume that those interests will not be lightly disturbed. They will be under the court's superintendence until, and if, some modification is ordered. All this can be done without doing violence to the principle that a child's significant relationship with its parents not be forever destroyed without compelling reasons.
On this record I would permit F to continue to be J's parent, albeit not her custodian. The future courses of matters such as these are not easily predicted. We should be slow to fix them unalterably.
I dissent and would affirm the judgment dismissing plaintiffs' complaint for adoption.