223 N.J. Super. 72 (1987)
537 A.2d 1345
IN THE MATTER OF THE ADOPTION OF A CHILD BY CELESTE BENIGNO-WHITE AND JEFFERSON WHITE.
Superior Court of New Jersey, Chancery Division Family Part, Monmouth County.
Decided December 3, 1987.
*73 Janice Davis Miller, for Celeste Benigno-White and Jefferson White (Miller & Gaudio, attorneys).
Ronald B. Rosen, for Dr. Kenneth Z. Taylor.
George Warren, guardian ad litem, for Philip Andrew Taylor.
Donald M. Lomurro, for Everett and Jean Taylor (Lomurro & Eastman, attorneys).
Ann Marie Seaton, Deputy Atty. Gen., attorney for the Division of Youth and Family Services (W. Cary Edwards, Atty. Gen. New Jersey).
Joyce L. Maraziti, Asst. Deputy Public Defender, Law Guardian for Philip Andrew Taylor in Title 9 proceeding (Alfred A. Slocum, Public Defender).
GEHRICKE, J.S.C.
This is an adoption matter in which the natural father, defendant Dr. Kenneth Taylor, (hereinafter Dr. Taylor) objects to the adoption of his son, Philip Andrew Taylor (hereinafter *74 Philip) by Philip's maternal aunt Celeste Benigno-White and her husband Jefferson White (hereinafter Whites), the plaintiffs in this action.
On November 11, 1984, Dr. Taylor murdered his wife. Following a jury trial defendant was convicted of knowing or purposeful murder [N.J.S.A. 2C:11-3a(1), (2)], and sentenced to the statutory term of life imprisonment with parole ineligibility for 30 years under N.J.S.A. 2C:11-3b. The conviction was upheld by the Appellate Division. State v. Taylor, A-924-85-T4 (Decided May 14, 1987). The Supreme Court denied certification on November 5, 1987.
On September 8, 9, 10 and 14, 1987, a preliminary hearing was held pursuant to N.J.S.A. 9:3-48a(4)(b) to determine the status of the parental rights of Dr. Taylor. At the preliminary hearing the Whites proved that Philip's daily needs, including food, shelter, clothing and health care were satisfied by the Whites. The Whites further proved that Dr. Taylor had not contributed anything towards the daily support of Philip since 1984, and that his incarceration for a minimum of 30 years prevents him from rendering the daily support and care which the Whites are currently providing.
Dr. Taylor contends that the Whites frustrated his efforts to maintain contact with Philip. He testified that the Whites would not accept his phone calls and that the letters he sent to Philip were not answered. Thus, he contends the lack of communication between he and Philip was not his fault. Dr. Taylor is presently earning $30 per month which goes to support his personal needs. It is the contention of Dr. Taylor that he can be an effective parent from prison.
Dr. Taylor proved at the preliminary hearing that he turned over $13,000 to his parents shortly after his arrest to provide food, shelter and clothing for Philip. He further proved that he sent money from prison to his parents while Philip was in their custody for the purpose of purchasing gifts for Philip and that he personally made gifts for Philip while in prison. Defendant *75 also proved that he has maintained phone contact with Philip as often as he is permitted by the prison authorities since his incarceration.
The only issue to be decided at the preliminary hearing is whether the rights of the natural father, Dr. Taylor, should be terminated. The issue of whether the best interests of the child would be promoted by the adoption is not before the court in this preliminary hearing.
This court is extremely cognizant of the gravity of this proceeding and approaches the issue of the termination of Dr. Taylor's parental rights with extreme caution. As Justice Rehnquist noted in Santosky v. Kramer, 455 U.S. 745, 787, 102 S.Ct. 1388, 1412, 71 L.Ed.2d 599 (1982), "[f]ew consequences of judicial action are so grave as the severance of natural family ties. Even the convict committed to prison and thereby deprived of his physical liberty often retains the love and support of family members."
Similarly, New Jersey courts have been very reluctant to terminate the rights of natural parents. "A child's relationship with a parent is of such moment that all doubts are to be resolved against its destruction." In re Adoption of J., 139 N.J. Super. 533, 547 (Crahay, J., dissenting) (App.Div. 1976), rev'd, 73 N.J. 68 (1977); see also A.L. v. P.A., 213 N.J. Super. 391, 396 (App.Div. 1986); In re N., 96 N.J. Super. 415, 423 (App.Div. 1967).
In a private non-agency adoption, as is presently before this court, "[a] natural parent may under N.J.S.A. 9:3-46a object to the adoption of his or her child at any time prior to the entry of judgment of adoption, even if the parent has given up custody." A.L. v. P.A., 213 N.J. Super. at 396. N.J.S.A. 9:3-46a provides:
Any parent who has not executed a surrender pursuant to Section 5 and whose parental rights have not been terminated by court order shall have the right to object to the adoption of his child. No judgment of adoption shall be entered over an objection by such parent communicated to the court by personal appearance or by letter unless the court finds that such parent has substantially failed to perform the regular and expected parental functions of care and support of the child, which shall include maintenance of an emotional relationship with the child.
*76 See also N.J.S.A. 9:3-48c(1). Thus, since Dr. Taylor has voiced his objection to the adoption of his son Philip by the Whites, this court cannot grant the adoption unless it is found that Dr. Taylor "substantially failed to perform the regular and expected functions of care and support ... which shall include maintenance of an emotional relationship...." (emphasis supplied).
In re Adoption of J., decided under an earlier adoption statute, is a case which is strikingly similar to the matter presently before the court. Although the case was decided under the old adoption statute, the similarity of the language to the present adoption statute leads this court to conclude that the case is applicable to the disposition of the present matter.[1]
In re Adoption of J. involved a situation where one parent murdered the other. The maternal grandparents sought to adopt the child of the marriage. The natural father opposed the adoption. The natural father was charged with the murder of his wife and sentenced to an indeterminate to ten-year term at the Youth Reception and Correction Center in Yardville, New Jersey.
The majority opinion focused its attention on the gravity of the crime committed by the natural father in finding an abandonment of parental rights. The court concluded that:
If the crime committed by a parent results in a conviction and is itself palpably hurtful to the child, then the commission of the crime should be a potent, if not determinative, factor in the evaluation of whether by that conduct the parent has forsaken his parental obligations. [139 N.J. Super. at 541]
and:
We conclude therefore the willful and unmitigated act of killing by one parent or the other is totally inconsistent with and utterly repugnant to the accepted duties owed a child by a parent. [139 N.J. Super. at 545]
*77 Judge Crahay's dissent, which was adopted by the Supreme Court, took objection to the majority's focus on the nature of the act itself. "However heinous the act of slaying may have been and however destructive of the family unit, it does not follow, in my view, that it constitutes a failure to perform parental obligations, after the criminal act, willfully and continuously, as the statute requires, so as to allow the irrevocable cessation of all parental rights." 139 N.J. Super. at 547.
Remaining consistent with that principle requires that this court's inquiry be on the consequences of the act, not on the nature of the act itself.
In re Adoption of J. involved a situation where the objecting natural father faced an indeterminate to ten-year sentence. Dr. Taylor on the other hand faces a mandatory minimum 30-year sentence under 2C:11-3b. The parent in In re Adoption of J. could have been released from prison at any time to resume a normal relationship with his son. Such is not the case with Dr. Taylor. Even assuming that Dr. Taylor only faces his minimum sentence of 30 years, Philip will be in his early thirties when he is released. He will be in prison for the entire time that Philip is a child. It is the opinion of this court that this is the type of situation Judge Crahay envisioned when he stated:
I, of course, do not mean to say that a parent's history of criminality and incarceration might never be such as to support a finding of abandonment of parental obligations. [139 N.J. Super. at 547 (Crahay, J., dissenting)]
Thus, the issue before this court is whether incarceration for a minimum of 30 years amounts to a "substantial failure to perform the regular and expected parental functions of care and support." N.J.S.A. 9:3-46a.
Several cases from outside jurisdictions have held that incarceration for life does not, as a matter of law, constitute abandonment so as to allow the cessation of parental rights. See, Adoption of Turner, 352 So.2d 957 (Fla. Dist. Ct. App. 1977); see also, Matter of Adoption of Herman, 406 N.E.2d 277 (Ind. Ct. App. 1980); Petition of Boston Children's Service Ass'n., 20 Mass. App. 566, 481 N.E.2d 516 (Mass. App. Ct. 1985).
*78 In all of those cases, however, the parental rights of the incarcerated parent were terminated. The courts held that incarceration for an extended period of time, when combined with various other factors, is tantamount to an abandonment of parental rights.
It is the opinion of this court that a court should not strain itself searching for additional criteria when confronted with a parent who will be incarcerated for the entire period of his child's infancy.
Under N.J.S.A. 9:3-46a parental rights may be terminated if the court finds that such parent has substantially failed to perform the regular and expected parental functions of care and support of the child. It is my opinion that incarceration for a period of 30 years, or for the entire time that Philip will need Dr. Taylor to perform the regular and expected parental functions of care and support, which are currently being provided by the plaintiffs, is sufficient to terminate parental rights. As was stated In the Interest of B.W., 479 So.2d 740 (Fla. Dist. Ct. App. 1985):
In its order of permanent commitment, the trial court recognized the interest Mr. Wirsing exhibited in his children during his incarceration but stated that the father never contributed to the children's support even during the period he was on parole and had a job. The court ruled that Mr. Wirsing abandoned his children in every respect except for giving "lip service" to maintaining an interest in them through letters. The court further noted that by continuing to commit criminal acts, which Mr. Wirsing knew, or should have known, would result in his incarceration and the removal from his children, he has demonstrated a lack of interest in the welfare of his children. This was an indicator of his intent to abandon them.
Whether one does or does not commit a crime is a purely voluntary act. When one commits a crime he is deemed to practically agree to suffer the consequences, all of them. It is cruel and inhumane to force children to rely upon as a father a person who has chosen to spend his life in prison and only sends letters to purport to fulfill his role as a father. A father nurtures and supports, he guides and uplifts. A father is available and willing to give of himself in order to raise his children to be whole persons who are prepared to face the world and work in it and contribute to it while enjoying all that the world has to offer. Children cannot do that without the assistance of parents. It is the duty of all of us to help all of the children to their best ends. If the natural parents fail, as the parents here have failed, then society, *79 through legislative enactment, has provided a way to come to the rescue of abandoned children. It is more noble to provide for the immediate and lasting needs of neglected and abandoned children than to preserve some undefined wishes in some nebulous future for a biological father who will be in prison for all the time these children are children. [at 741; emphasis supplied]
These in my mind represent the regular and expected parental functions of care and support. Dr. Taylor through his testimony seems to have couched his argument on the belief that he can provide emotional support from prison. The statute is quite clear in that it requires more than just emotional support. A parent must perform the regular and expected parental functions of care and support in order to comply with the requirements of the statute: "[O]ne cannot hold to parental rights and disregard concurrent parental obligations. The latter are of paramount importance." Thomas v. Culpepper, 356 So.2d 656, 658-59 (Ala. Civ. App. 1978).
All doubts as to the termination of Dr. Taylor's parental rights have been resolved. Dr. Taylor has substantially failed to perform and will be unable to discharge those duties for no less than 30 years.
It is the decision of this court that the parental rights of Dr. Taylor should be and hereby are terminated. The adoption should now proceed to a final hearing. Since this preliminary hearing was held, a search of the Surrogate's file reveals that the adoption petition of the paternal grandparents, Everett and Jean Taylor, was made inactive rather than dismissed as had been believed. Accordingly, the final hearing will deal with both adoption petitions.
NOTES
[1] N.J.S.A. 9:3-17 et seq. was repealed by N.J.S.A. 9:3-37 et seq. N.J.S.A. 9:3-24 required the court to determine that a parent had "forsaken parental obligations" in order to terminate parental rights. Under N.J.S.A. 9:3-18 forsaken parental obligations was defined as the "willful and continuous neglect or failure to perform the natural and regular obligations of care and support of a child."