258 N.J. Super. 614 (1992)
610 A.2d 925
IN THE MATTER OF THE ADOPTION OF CHILDREN BY L.A.S.
Superior Court of New Jersey, Appellate Division.
Argued February 19, 1992.
Decided August 10, 1992.
*615 Before Judges ANTELL, BAIME and THOMAS.
Harriet J. London argued the cause for contesting natural father, H.E. (Seton Hall University Family Law Clinic, attorneys; Harriet J. London on the letter brief).
Maureen Goode argued the cause for respondent (Greenberg, Mellinger, Sanders & Frese, attorneys; Maureen Goode on the brief).
The opinion of this court was delivered by THOMAS, J.S.C., temporarily assigned.
Appellant is appealing from an Order of August 21, 1991 terminating his parental rights as natural father of his two boys, aged 12 and 14, and granting adoption.
The boys have been living with their mother and adoptive father since 1982. Appellant is serving a life sentence with 30 years parole ineligibility following his conviction for conspiracy *616 and murder in 1986. He has exhausted his appeal process without success.
The trial court held appellant's incarceration for the next 24 years constituted an abandonment because he would not be able to perform any of his parental functions. The trial court questioned the boys in camera and found they wanted the adoption.
The following issues were raised in appellant's brief:
I. THE TRIAL COURT ERRED IN BASING THE TERMINATION OF PARENTAL RIGHTS SOLELY ON THE NATURAL FATHER'S INCARCERATION
A. [APPELLANT'S] CONVICTION WAS NOT FINAL
B. NEITHER INCARCERATION PER SE NOR COMMISSION OF A CRIME ARE GROUNDS FOR TERMINATION OF PARENTAL RIGHTS
C. THERE IS AN ALTERNATIVE TO TERMINATION OF PARENTAL RIGHTS IN THIS CASE
II. THE TRIAL COURT ERRED IN ITS REFUSAL TO ORDER A PSYCHOLOGICAL EVALUATION OF THE CHILDREN
III. THE TRIAL COURT ERRED IN ITS REFUSAL TO APPOINT A GUARDIAN AD LITEM FOR THE CHILDREN
IV. THE ADOPTION PROCEEDING SHOULD HAVE BEEN STAYED PENDING THE EXHAUSTION OF [APPELLANT'S] CRIMINAL APPEAL
H.E. and L.E. (now L.S.  the natural mother) were married on October 29, 1976. Two children were born of the marriage  H.A.E. (born May 8, 1977) and J.B.E. (born December 14, 1978).
L.S. was divorced from H.E. on September 8, 1982. Joint custody was awarded at that time and visitation was granted to H.E.L.A.S. (adoptive parent) and L.S. (natural mother) were married in December of 1982. The children have resided with their mother and L.A.S. since that time. However, L.A.S. has supported the children since 1981.
H.E. visited the children a few times after the divorce and before his arrest. H.E. and his brother W.E. were arrested in early 1985 and charged with hiring a man to kill W.E.'s ex-wife. H.E. denied involvement in the crime. H.E. was convicted of conspiracy to commit murder and first degree murder on June 17, 1986 and was sentenced to life with thirty years parole *617 ineligibility. Since his arrest, H.E. has only seen his children once, during a prison visit approximately six years ago.
The children were examined in 1985 by Dr. Hagovsky after their paternal grandparents requested visitation. Dr. Hagovsky wrote a psychological evaluation which also addressed the children's need to see their father. Dr. Hagovsky stated, "The children also have a need to continue contact with their father who has been a consistent figure to them over the past five or six years. Whatever arrangements may be possible in this regard so as not to traumatize them should be investigated." The children were eight and six years old at the time.
H.E. testified he attempted to maintain contact with the boys through cards and letters but could not obtain current addresses or phone numbers as the attorney for the mother and adoptive father refused to give him the information. H.E. sought assistance from the prison chaplain and a social worker but their efforts were unsuccessful. H.E. is currently incarcerated at Trenton State Prison and is being treated for cancer.
Appellant's Point IA and Point IV are moot since conviction and sentencing are now final. We do not find that an updated psychological evaluation of these two children was necessary to the adoption determination nor was the appointment of a guardian ad litem required.
However, it is obvious from the record that the only basis for the adoption and termination of parental rights was the father's incarceration.
The trial judge noted:
When someone commits a crime that is a purely voluntary act and it is the same thing as intentionally saying that I intend to have the consequences of that crime be visited upon me. Which one would have to know would mean imprisonment ... in a case of murder.
....
It is cruel and ... inhumane to force children to rely upon as a father a person who has chosen to spend his life in prison and who only sends letters to purport to fulfill his role as a father.
....

*618 It is more noble to provide for the immediate and lasting needs of neglected and abandoned children than to preserve some undefined wishes in some nebulous future for a biological father who will be in prison for all the time that these children are children.
....
There is no doubt that he has abandoned these children for the last five or six years that he's in prison. And as I said, he will not be able to correct that situation for at least another 24, 25 years.
Lastly, the trial judge found, "The evidence clearly indicates that the granting of this application is in the best interests of H.A.E. and J.B.E. and the adoption is granted."
Initially, we note the reluctance of courts generally to approve the termination of something so fundamental as the relationship of natural parent and child. "Few consequences of judicial action are so grave as the severance of natural family ties. Even the convict committed to prison and thereby deprived of his physical liberty often retains the love and support of family members." Santosky v. Kramer, 455 U.S. 745, 787, 102 S.Ct. 1388, 1412, 71 L.Ed.2d 599, 628 (1982).
Our Supreme Court has commented on this troublesome issue in N.J. Div. of Youth & Family Services v. A.W., 103 N.J. 591, 599, 512 A.2d 438 (1986):
Termination of parental rights presents the legal system with an almost insoluble dilemma. On the one hand, we emphasize the inviolability of the family unit, noting that "[t]he rights to conceive and to raise one's children have been deemed `essential,' * * * `basic civil rights of man,' * * *" and `[r]ights far more precious * * * than property rights' * * *." [Citations omitted]. The interests of parents in this relationship have thus been deemed fundamental and are constitutionally protected.
See also In re Adoption of J., 139 N.J. Super. 533, 548, 354 A.2d 662 (App.Div. 1976) (Crahay, J.A.D., dissenting), rev'd on dissent, 73 N.J. 68, 372 A.2d 607 (1977) ("A child's relationship with a parent is of such moment that all doubts are to be resolved against its destruction").
In re Adoption of J. is of special significance because the factual basis for the original termination decision, reversed by the Supreme Court, was a finding of abandonment based upon *619 the father's incarceration for killing the child's mother. Judge Crahay said in his dissent:
However heinous the act of slaying may have been and however destructive of the family unit, it does not follow, in my view, that it constitutes a failure to perform parental obligations, after the criminal act, willfully and continuously, as the statute requires, so as to allow the irrevocable cessation of all parental rights.
Id. at 547, 354 A.2d 662.
N.J.S.A. 9:3-48, the statute forming the basis for the court's decision in the present case, permits adoption under subsection (e) if there has been "intentional abandonment or very substantial neglect of parental duties without a reasonable expectation of a reversal of that conduct in the future." N.J.S.A. 9:3-48c(1). Thus, we turn to the question, does incarceration alone constitute abandonment of one's child?
Respondent places great reliance upon Matter of the Adoption of Benigno-White, 223 N.J. Super. 72, 537 A.2d 1345 (Ch.Div. 1987). Benigno-White factually is similar to the present case in that the father whose rights were terminated was serving a 30 year minimum sentence for murder. The trial court in the present case discussed Benigno-White and distinguished it from In re Adoption of J. based upon the different terms of incarceration  30 years in Benigno-White versus an indeterminate term with a maximum of 10 years in In re Adoption of J. The Chancery Division Judge in Benigno-White concluded:
It is the opinion of this court that a court should not strain itself searching for additional criteria when confronted with a parent who will be incarcerated for the entire period of his child's infancy.
Under N.J.S.A. 9:3-46a parental rights may be terminated if the court finds that such parent has substantially failed to perform the regular and expected parental functions of care and support of the child. (Emphasis supplied). It is my opinion that incarceration for a period of 30 years, or for the entire time that [the child] will need [the parent] to perform the regular and expected parental functions of care and support, (emphasis supplied) which are currently being provided by the plaintiffs, is sufficient to terminate parental rights.
....
These in my mind represent the regular and expected parental functions of care and support (emphasis supplied). [The parent] through his testimony seems to have couched his argument on the belief that he can provide emotional support from prison. The statute is quite clear in that it requires more than *620 just emotional support. A parent must perform the regular and expected parental functions of care and support in order to comply with the requirements of the statute: "[O]ne cannot hold to parental rights and disregard concurrent parental obligations. The latter are of paramount importance." [Citation omitted].
Matter of the Adoption by Benigno-White, supra, 223 N.J. Super. at 78-79, 537 A.2d 1345.
Some states follow this theory, that incarceration alone constitutes abandonment. See Hutson v. Haggard, 475 S.W.2d 330, 333 (Tex.Civ.App. 1971) where the court said, referring to a sentence of 10 to 25 years:
[W]e are of the opinion that appellant's wilful criminal acts and course of conduct has been such as implies a conscious disregard [emphasis added] and indifference to [his child] in respect to his parental obligations that he as a parent owed to her. Thus, we reject the contention that imprisonment does not constitute voluntary abandonment....
See also In re Welfare of Scott, 309 Minn. 458, 244 N.W.2d 669 (1976); In re B.A.M., 290 N.W.2d 498 (S.D. 1980); In re Sego, 82 Wash.2d 736, 513 P.2d 831 (1973); Turner v. Adoption of Turner, 352 So.2d 957 (Fla. Dist. Ct. App. 1977); Adoption of Kurth, 16 Wash. App. 579, 557 P.2d 349 (1976); In re Sarah H., 106 Cal. App.3d 326, 165 Cal. Rptr. 61 (1980); In re Abdullah, 85 Ill.2d 300, 53 Ill.Dec. 246, 423 N.E.2d 915 (1981); In re Geoffrey G., 98 Cal. App.3d 412, 159 Cal. Rptr. 460 (1979); Avera v. Rainwater, 150 Ga. App. 39, 256 S.E.2d 648 (1979); and In re Brannon, 340 So.2d 654 (La. App. 1976).
Other jurisdictions, however, regard incarceration only as a factor to be considered, along with others, to determine if abandonment has occurred. See In the Matter of the Adoption of John Doe, 99 N.M. 278, 282, 657 P.2d 134, 138 (N.M.Ct.App. 1982) where the court stated:
Abandonment rests upon incarceration coupled with other factors such as parental neglect, lack of affection shown toward the child, failure to contact the child, financially support the child if able to do so, as well as disregard for the general welfare of the child.
See also Andersen v. Crouse, 83 Or. App. 216, 730 P.2d 1275 (1986) (incarceration alone is rarely enough to warrant the involuntary termination of parental rights) and Thompson v. *621 King, 393 N.W.2d 733, 735 (N.D. 1986) where the court commented:
[W]e cannot consider his incarceration to be the controlling factor. [Citation omitted]. Certainly, a parent incarcerated has a difficult time maintaining physical contact with a child. We [have] concluded .. . [citation omitted] that imprisonment, combined with other factors such as parental neglect, withholding of affection, lack of financial or other support, and no contact would support a finding of abandonment.
The Thompson court conceded that inability to perform parental duties will stem from imprisonment so that factor alone should not be conclusive as to abandonment. The court, therefore, suggested that there should be an inquiry into what efforts were made to maintain personal contact, given the limitation of incarceration. Accord In re Interest of B.A.G. Jr., 235 Neb. 730, 457 N.W.2d 292 (1990); In re Adoption of M.J.H., 348 Pa.Super. 65, 501 A.2d 648 (1985); and In re Randy Scott B., 511 A.2d 450 (Me. 1986).
We approve the multi-facet evaluation of abandonment in which incarceration is but one of the factors considered. Thus we reject the narrow single factor approach expressed in Benigno-White. We, therefore, reverse and remand for a further hearing in which both sides may present evidence refuting or supporting abandonment. This should include an inquiry into what relationship existed between the father and his sons before and after separation and divorce. What financial support did he make after the separation? Was there a support order and did he obey it? What care, love, protection and affection has the parent provided? What contact occurred before incarceration and what efforts at contact occurred during incarceration?
In remanding, we must further comment on the trial judge's decision which, in part, was based upon the best interests of the children. He stated that, "The evidence clearly indicates that the granting of this application is in the best interests of H.A.E. and J.B.E...."
*622 On this issue, we underscore the language of our Supreme Court in A.W.:
We emphasize ... that the `best interests' of a child can never mean the better interests of the child. In re Guardianship of Cope, 106 N.J. Super. 336, 340-41 [255 A.2d 798] (App.Div. 1969). It is not a choice between a home with all the amenities and a simple apartment, or an upbringing with the classics on the bookshelf as opposed to the mass media, or even between parents or providers of vastly unequal skills.
N.J. Div. of Youth & Family Services v. A.W., supra, 103 N.J. at 603, 512 A.2d 438.
There is no question that if this was a custody case, the best interests of the children should be given paramount consideration and would rest with the adoptive parent. But this is not a custody case. The distinction between custody and termination with respect to the "best interests of the child" criteria was clearly explained in Matter of Baby M, 109 N.J. 396, 445, 537 A.2d 1227 (1988), where the court held:
Although the question of best interests of the child is dispositive of the custody issue in a dispute between natural parents, it does not govern the question of termination. It has long been decided that the mere fact that a child would be better off with one set of parents than with another is an insufficient basis for terminating the natural parent's rights. [Citations omitted].... . It must be noted, despite some language to the contrary, that the interests of the child are not the only interests involved when termination issues are raised. The parent's rights, both constitutional and statutory, have their own independent vitality. [Citation omitted].
Thus, while the question of the children's best interests should be considered, "... it does not govern the question of termination."
We note also this later question involving the best interest of the children might well involve expert testimony as to the present and future psychological effects on these children if an adoption is, or is not, granted. Therefore, our earlier comment about a psychological evaluation should not be taken as a bar to an updated evaluation with this view in mind.
Reversed and remanded for further proceedings in accordance with this opinion.