555 P.2d 906
In the Matter of the ADOPTION OF
John DOE, a child.

Grandfather DOE, on behalf of John Doe,
a child, Petitioner-Appellant,

v.

Richard HEIM, Director, New Mexico Department of Health and Social Services, Barbara Daniels, Director, Chaparral Home & Adoption Services, John and Mary Doe, Respondents-Appellees.

No. 2407.

Court of Appeals of New Mexico.
Aug. 31, 1976.
Rehearing Denied Sept. 10, 1976.
Certiorari Denied Oct. 21, 1976.

608

Michael V. Stuhff, Navajo Legal Aid & Defender Service, Window Rock, Ariz., Noelle L'Hommedieu Schoen, Albuquerque, for appellant Grandfather Doe.

Patricia M. Goldsmith, DMA, People's Legal Services, Window Rock, Ariz., for natural father.

Irwin S. Moise, Ronald J. Segel, Sutin, Thayer & Browne, P.C., Albuquerque, for appellees Chaparral Home & Adoption Services, John and Mary Doe.

Toney Anaya, Atty. Gen., Julia C. Southerland, David S. Cohen, Asst. Attys. Gen., Sante Fe, for amicus curiae New Mexico Health & Social Services Dept.

Bertram E. Hirsch, Lawrence A. Rappoport, New York City, for amici curiae Ass'n on American Indian Affairs, Inc., and the Navajo Nation of Indiana.

## OPINION

WOOD, Chief Judge.

This appeal involves the adoption and custody of a child. The mother, father and grandfather of the child are Navajos. Chaparral (Chaparral Home & Adoption Services) is the adoption agency. Petitioners, the adoptive parents, are non-Indians. "Association" refers to the Association on American Indian Affairs, Inc. and the Navajo Nation of Indians. H.S.S.D. is the New Mexico Department of Health and Social Services. Association and H.S.S.D. are amici curiae; H.S.S.D. having been dismissed as a party to the habeas corpus proceeding.

The mother turned the child over to Chaparral for adoption. Chaparral placed the child with petitioners. Petitioners filed a petition to adopt the child on May 17, 1975. Grandfather brought a habeas corpus proceeding on May, 22, 1975. The trial court dismissed the habeas corpus proceeding and granted the adoption petition. Grandfather and father appeal.

We divide the issues into three categories. Part A considers matters not raised in the trial court or not supported by the record. Part B considers the grandfather's custody claims. Part C considers the claims involving the adoption. Statutory references are to the "Adoption Act", § 22-2-20 and following sections, N.M.S.A. 1953 (1975 Supp.) unless otherwise noted.

### A. *Procedural Matters*

■ Many of the matters argued in the briefs of the Association, the grandfather and the father either (1) ignore or misconstrue the proceedings in the trial court, or (2) are raised for the first time on appeal. Under this point we review the proceedings and identify and dispose of matters not properly before us. We also identify and dispose of contentions for which there is no support in the record. In considering these matters, the following rules are applicable: (a) Matters not of record are not before the reviewing court

on appeal. *Macnair v. Stueber*, 84 N.M. 93, 500 P.2d 178 (1972). (b) Matters not presented to or ruled on by the trial court are not before us for review. Rule of Appellate Procedure 11. (c) The requirement that matters must have been decided by the trial court applies to constitutional questions. *Chessport Millworks, Inc. v. Solie*, 86 N.M. 265, 522 P.2d 812 (Ct.App.1974). (d) The Association, as an amicus, must accept the case on the issues as raised by the parties. *State ex rel. Castillo Corp. v. New Mexico St. T. Com'n*, 79 N.M. 357, 443 P.2d 850 (1968).

The grandfather sought custody of the child in the habeas corpus proceeding. An evidentiary hearing was held on June 27, 1975. The trial court limited the hearing to the issue of whether the grandfather had standing to obtain custody of the child. At the conclusion of this hearing the court ruled orally that the grandfather had no standing to challenge the custody of the child under New Mexico law. The trial court invited briefs on the question of whether the grandfather had a right to custody of the child under Navajo custom. Apparently there was an oral ruling of the court because on July 18, 1975 the grandfather moved for rehearing. His motion argued both New Mexico law and Navajo custom. On September 2, 1975 an order was entered discharging the writ of habeas corpus. In that order the trial court found that the grandfather was not a custodian within the meaning of New Mexico's adoption statutes and, therefore, the grandfather lacked standing.

At a motion hearing on September 29, 1975, the trial court orally announced that it was going to reconsider its decision in the habeas corpus proceeding on the basis of the decision in *Shortly v. Scott*, 87 N.M. 490, 535 P.2d 1341 (1975).

On November 12, 1975 the trial court held an evidentiary hearing on the father's motion to strike his written consent to the adoption. At the conclusion of the hearing, the trial court orally ruled that there had been a fraud upon the father and that the father's consent would be set aside.

On November 18, 1975 the trial court stated that it had "generally" disposed of the habeas corpus proceeding and had set aside the father's consent. The court proceeded with an evidentiary hearing on the adoption petition and on the question of whether the father had abandoned the child. The court announced that if the child had to be placed somewhere, the grandfather would be one of the persons considered as a possible placement. The grandfather participated in this hearing; his counsel called witnesses on the grandfather's behalf, cross-examined witnesses called by the petitioners, and made a closing argument.

Petitioners, the father and the grandfather submitted requested findings of fact and conclusions of law. The trial court entered its findings and conclusions on December 18, 1975. Both the requests and the trial court's decision went to the merits of the habeas corpus proceeding and the adoption petition.

On December 19, 1975 the trial court entered orders which denied the father's motion for rehearing, discharged the writ of habeas corpus after rehearing, and granted the adoption petition.

The grandfather asserts that the trial court denied him standing to assert his right to custody and this denied him due process of law. He also asserts that he was denied due process because the trial court made it clear, in regard to the adoption proceedings, that the grandfather would be considered only as a possible placement for the child. The record shows that the grandfather's right to custody was fully litigated and that he participated fully in the hearing which began November 18, 1975. The contentions have no record support. The contentions confuse the purported ruling as to lack of standing (discussed subsequently in this opinion at B(5)) with the right to litigate the claims. The claims were fully litigated.

The grandfather asserts he has a right to raise a family and the trial court failed to protect that right. The Association asserts that Navajo parents and children have a right to live together as a family and protect their cultural integrity. According to the grandfather and the Association, these are rights found in the First, Ninth and Fourteenth Amendments to the Constitution of the United States and were rights violated by the trial court. These contentions were neither presented to nor ruled on by the trial court.

The Association asserts the father and grandfather were denied due process of law by the failure of the trial court to recognize Navajo extended family structures and child rearing practices. No such claim was presented to or ruled on by the trial court.

The Association contends that New Mexico's adoption act, on its face, and as applied, violated both due process and equal protection of the law. No such claim was presented to or ruled on by the trial court.

The Association claims just about everybody's right to due process was violated because the trial court utilized the most drastic alternative in determining the best interests of the child. The Association also claims that the term "abandonment" in our adoption statutes is unconstitutionally vague. These claims were not presented to nor ruled on by the trial court.

The Association, the father and the grandfather, contend that the trial court erred in failing to hold a separate hearing concerning the termination of the father's parental rights before conducting a hearing on the adoption application. These contentions were not presented to nor ruled on by the trial court.

The Association claims the father was denied equal protection of the law because the trial court gave more weight to the mother's interests than to the father's interests. No such claim was presented to nor ruled on by the trial court.

The grandfather contends that somehow Chaparral is responsible for the child having been removed from the grandfather's house and that before removal of the child, Chaparral should have held a hearing for "custodial relatives" because of the Navajo tradition of an extended family. The record does not support these claims. The mother and child were living in the grandfather's home; the mother brought the child to Chaparral. Nothing shows that Chaparral instituted or was responsible for the mother's action.

The father claims the trial court erred in permitting the mother's deposition to be read into evidence at the hearing which began November 18, 1975. The record shows the father withdrew his objection to this procedure.

The father contends that the "basic error" of the trial court, in deciding that the father had abandoned the child, was the failure to separate issues relating to abandonment by the father and those relating to the fitness of the father. The "failure to separate" argument is applied both to the procedure followed in receiving evidence and to the analysis of the evidence. The record does not support these contentions. There was no objection to the procedure followed in receiving evidence and in closing argument the father's counsel stated there was nothing wrong with the procedure. The trial court's findings (discussed subsequently in the opinion at B(3) and C(3 & 4)), show the trial court did not confuse issues in analyzing the evidence.

### B. *Grandfather's Custody*

The parents of the child are not and never have been married. They lived together for a period of time while the mother was pregnant, but had ceased living together at the time of the child's birth.

At the time of the birth, the mother was living with her father—grandfather of the child. The father moved into the home shortly after the birth. Before the child was six months old, the mother asked the

father to leave the home because the father had struck the child. The father moved out.

From the time of the child's birth in March, 1972 until the mother delivered the child to Chaparral in March, 1975, the grandfather "provided in his own house for the care, custody and control, shelter, food and clothing of the child". During this period of time the grandfather gave the child his personal care and attention "including feeding, changing diapers, washing and bathing". The grandfather was "primarily responsible for the care, custody and control of the child until March of 1975."

On March 17, 1975 the child was placed with petitioners for adoption. The adoption petition was filed May 17, 1975. On May 22, 1975 the grandfather filed a habeas corpus petition which alleged that the grandfather was the custodian of the child and which asked that the child be returned to the grandfather's custody.

The trial court dismissed the writ of habeas corpus. The grandfather appeals. See *Evens v. Keller,* 35 N.M. 659, 6 P.2d 200 (1931).

1. Custody Under The Statute

■ Section 22–2–25, supra, refers to the written consent of a custodian to an adoption petition. Section 22–2–26, supra, refers to situations where the custodian's consent is not required. If the grandfather were in fact the custodian of the child, one of these sections would be applicable to the adoption proceedings.

Section 22–2–21(G), supra, defines custody. Prior to an amendment in 1975, custody was defined to mean "actual physical custody". Laws 1971, ch. 222, § 2. The 1975 amendment defines custody to mean "legal custody". Laws 1975, ch. 185, § 1. The 1975 amendment was not in effect when the adoption petition was filed. The applicable definition is "actual physical custody".

■ The grandfather contends he was the custodian of the child under § 22–2–21(G), supra. This contention is erroneous. The grandfather did not have actual physical custody of the child after sometime in March, 1975. The adoption petition was filed in May, 1975.

2. Right to Custody Under New Mexico Law

■■ The grandfather sought to obtain the actual physical custody of the child in the habeas corpus proceeding. The trial court correctly ruled that the grandfather did not have standing under New Mexico law to obtain physical custody of the child. The grandfather had no natural or inherent right to custody of the child. The grandfather did not show a prima facie legal right to custody because the former custody of the child was insufficient to establish a prima facie right. *Roberts v. Staples,* 79 N.M. 298, 442 P.2d 788 (1968); see *Shorty v. Scott,* supra; Compare, *State v. Marshall,* 58 N.M. 286, 270 P.2d 702 (1954).

3. Right to Custody Under Navajo Tribal Custom

■ The trial court found that Navajo custom and tradition confers upon grandparents, particularly maternal grandparents, the status of custodians of the grandchildren. The trial court also found that the grandfather's care for the child was in accordance with this tradition.

The grandfather asserts that Navajo custom gave him a right to custody of the child and, therefore, he had standing to seek custody of the child in the habeas corpus proceeding. On the basis of the unchallenged finding of the trial court, we agree. The grandfather also contends that this Navajo custom was entitled to "full faith and credit" in New Mexico courts. We assume, but do not decide, that this is correct. However, it does not follow that the trial court erred in dismissing the writ of habeas corpus and in refusing to award custody to the grandfather.

■ The "full faith and credit" provision is not an inexorable and unqualified command where a foreign law is

sought to be enforced in the forum state. *Jim v. CIT Financial Services Corporation,* 87 N.M. 362, 533 P.2d 751 (1975). Under *Jim,* supra, New Mexico need not subordinate its own policy to a conflicting Navajo custom. New Mexico's policy of considering the welfare of the child is applicable even when "full faith and credit" is relied on. *Tuft v. Tuft,* 82 N.M. 461, 483 P.2d 935 (1971).

The grandfather had a right to custody under Navajo custom; he had no such right under New Mexico law. If we accord the grandfather his right under Navajo custom, his position is not superior to the petitioners' who not only have a right to custody, but actual physical custody of the child. Petitioners obtained custody from Chaparral who in turn obtained custody from the mother. As to the mother's right to custody, see *Bustamento v. Analla,* 1 N.M. (Gild.) 255 (1857). The mother not only turned over physical custody of the child but signed a written consent to the adoption.

 When two persons have a right to custody, the situation is similar to that where parents contest the right to custody of their child. In such a situation the right to custody need not be considered because both parties are on equal footing. In such a situation the welfare and best interests of the child are the paramount consideration. *Shorty v. Scott,* supra.

The trial court concluded that it would not be in the best interest of the child for the child to be placed in the custody of the grandfather. Various findings support this conclusion.

 The findings are to this effect: (a) The mother decided that she could not provide a proper upbringing for the child in the grandfather's home because of the grandfather's alcoholism and the instability of the home, and that the child would be irreparably damaged by remaining there. (b) The mother was raised by non-Indian relatives in California from the age of three until the age of sixteen, when she returned to New Mexico to live with grandfather. (c) As a result of her upbringing, the mother does not speak the Navajo language, does not practice traditional Navajo customs and identifies more with non-Indians than with Navajo culture. (d) The mother requested the child be placed for adoption with a non-Indian family. (e) At the time the child was turned over to Chaparral, the child, approximately three years old, was not toilet trained and did not appear to have achieved the anticipated level of emotional and intellectual development for a child of his age. At that time the child had a very limited vocabulary and communicated largely by non-verbal means. (f) After placement with petitioners, the child became toilet trained and made considerable progress in intellectual development and "in both receptive and expressive language." (g) Petitioners have great love and concern for the child, provide a comfortable, stimulating and suitable home for the child, and have performed well as parents for the child. (h) The grandfather sells Indian jewelry for a living and spends a substantial portion of his time traveling away from his home. (i) Removing the child from petitioners and transferring custody to the grandfather would cause trauma to the child, would impair his emotional development and would not be in the best interest of the child.

The findings are supported by substantial evidence. *Pra v. Gherardini,* 34 N.M. 587, 286 P. 828 (1930); see *Crosby et ux. v. Harral et ux.,* 35 N.M. 575, 4 P.2d 655 (1931).

4. Continued Custody is Required by the Constitution

(a) The grandfather contends that he has a constitutional right "to the continued custody" of the child. This right is asserted to be the constitutional right to liberty, a violation of which is asserted to be a violation of due process. Implicit within this contention is the grandfather's view that his desire to maintain his ethnic heritage

and customs is the paramount interest in the case.

These contentions ignore the facts found by the trial court. The mother had, in essence, rejected Navajo custom and desired that her child be adopted by non-Indians. After placement with non-Indians, the child made considerable progress. The grandfather spends a substantial portion of his time away from home. Returning the child to the grandfather would impair the child's development and would not be in the child's best interests.

The above contentions also ignore the law. New Mexico's legal standard, which was applied by the trial court, was the best interests of the child.

The grandfather's asserted right to continued custody and his desire to maintain his ethnic heritage and customs are not the paramount interests involved in this case. The paramount interest is the best interest of the child, and that interest is determined on the basis of facts presented to the trial court. *Tuft v. Tuft,* supra; *Pra v. Gherardini,* supra. Any constitutional right in the grandfather (we do not attempt to define or declare such a right) in connection with the child's custody is necessarily subordinate to the best interests of the child. Any other rule opens the possibility of a return to peonage. Compare, *Bustamento v. Analla,* supra.

Both the grandfather and the father contend that the trial court erred in concluding that it would not adopt the authority of Navajo culture as to custody of a minor in an extended family when the mother had rejected that culture. It is unnecessary to answer this contention. Even if the conclusion should be wrong (which we do not decide), it does not aid the grandfather. The legal standard, applied in this case, was the best interests of the child. The trial court having correctly applied the applicable legal standard, any error in the challenged conclusion does not change the result. See *Tsosie v. Foundation Reserve Insurance Company,* 77 N.M. 671, 427 P.2d 29 (1967).

(b) The grandfather also contends that before his right to custody could be terminated the Constitution requires that the State show a compelling state interest. The State is not a party to these proceedings. Accordingly, we understand this claim to mean that the court could not constitutionally reach a decision adverse to the grandfather's custody claim unless a compelling state interest for such result existed. Without deciding whether a "compelling state interest" applies in these proceedings, our answer is that the best interests of the child are a compelling state interest and that was the standard applied.

5. Grandfather's Standing

The contention is that the trial court erred in holding that the grandfather lacked standing to challenge the custody of the child. The trial court so ruled three times. We identify and eliminate two of these rulings because they present no appellate issue.

The first ruling was the trial court's oral ruling which resulted in the motion for rehearing filed July 18, 1975. This was not a reviewable ruling because oral. *Specter v. Specter,* 85 N.M. 112, 509 P.2d 879 (1973).

The second ruling was the order of September 2, 1975. That order ruled that the grandfather lacked standing because the grandfather was not a custodian within the meaning of New Mexico's adoption statutes. This ruling was correct, insofar as it went, because the applicable statute defined custodian in terms of actual physical custody. The grandfather did not have actual physical cutody. See discussion in B(1) above. This order did not rule on the grandfather's "right to custody" contention. However, we do not consider this order further because the trial court granted the motion for rehearing.

After rehearing, the trial court entered its findings of fact and conclusions of law. One of the conclusions is that the grandfather had no legal right to the custody of the child. The order discharging the writ

of habeas corpus refers to the court's prior "standing" decision (see immediately preceding paragraph) and recites that on rehearing, the court found no grounds for modifying its prior decision. These two items—the conclusion of law and the order discharging the writ—are the basis for the contention that the trial court held the grandfather lacked standing to challenge the custody of the child. In our opinion, this is a fair interpretation of these two items.

This holding of "lack of standing" is inconsistent with the finding that the grandfather had a right to custody under Navajo custom, inconsistent with the fact that the grandfather's right to custody was fully litigated, and inconsistent with both the finding and conclusion that it would not be in the best interests of the child to be placed in the custody of the grandfather. See discussion in B(3).

■ We assume that the "lack of standing" conclusion is erroneous. The situation then is that the trial court reached a legally correct result because there is substantial evidence to support the finding that it would not be in the best interests of the child to be placed in the grandfather's custody. In reaching that result it applied one correct conclusion (best interests of the child) and one incorrect conclusion (lack of standing). The result reached being correct, the erroneous conclusion does not aid the grandfather. *Tsosie v. Foundation Reserve Insurance Company,* supra.

C. *The Adoption*

1. Jurisdiction

■ A jurisdictional claim can be raised for the first time on appeal. *Chavez v. County of Valencia,* 86 N.M. 205, 521 P.2d 1154 (1974). The Association asserts that New Mexico courts "do not have jurisdiction to decree the adoption" of the child.

■ In contending that the district court had jurisdiction, petitioners rely on *Wallace v. Wallace,* 63 N.M. 414, 320 P.2d 1020 (1958). *Wallace* discusses three grounds for jurisdiction in custody cases —domicile of the child, physical presence of the child or in personam jurisdiction over both parents. *Wallace* states: "[A] state which meets any of the above jurisdictional tests has a sufficient social interest in the welfare of the child to justify its courts in concerning themselves with his custody." *Wallace* is not authority for holding that the district court had jurisdiction because it dealt with custody of a child in a divorce case. "Adoption proceedings are solely statutory and the jurisdictional requirement of the statute must be strictly followed." *Mayer v. Department of Public Welfare,* 75 N.M. 201, 402 P.2d 942 (1965).

■ Section 22–2–29(A), supra, states that the court has jurisdiction over an adoption proceeding if at the time of filing or granting the petition, any petitioner, or the individual to be adopted, actually resides in New Mexico. At the time of filing of the petition in this case, both petitioners and the child resided in New Mexico. The district court had jurisdiction to decree the adoption. *Mayer v. Department of Public Welfare,* supra.

The Association claims that the Navajo Nation has the exclusive jurisdiction to determine the permanent custody of its minor members. Decisions concerning such a jurisdictional claim are ones where the child was a resident of or domiciled on an Indian reservation. *Fisher v. District Court,* 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed. 2d 106 (1976); *Wisconsin Potowatomies, Etc. v. Houston,* 393 F.Supp. 719 (U.S.D.C. Mich. 1973); *Wakefield v. Little Light,* 276 Md. 333, 347 A.2d 228 (1975). This record does not show that the child either resided or was domiciled on the Navajo Reservation.

■ The Association asserts that the jurisdiction of the Navajo Nation should extend to minor members neither domiciled

nor residing on the reservation. The argument in support of this assertion is based on the concept of Indian sovereignty and that the Navajo Nation stands in the relation of parens patriae to all Navajo children. These arguments suggest that Navajo tribal courts might have jurisdiction if proceedings were initiated in those courts. In such a situation, the Navajo courts might have concurrent jurisdiction with New Mexico courts. See *Wallace v. Wallace,* supra. The Association's contention, however, is that the Navajo Nation has *exclusive* jurisdiction. We disagree because the child lived with his mother in Gallup, New Mexico. Whatever concurrent jurisdiction the courts of the Navajo Nation might have, New Mexico had an interest in the welfare of the child who was in New Mexico and not within the boundaries of the reservation. See *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973); *In Re Cantrell,* 159 Mont. 66, 495 P.2d 179 (1972); *Compare, DeCoteau v. District County Court,* 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975), reh. denied, 421 U.S. 939, 95 S.Ct. 1667, 44 L.Ed.2d 95 (1975).

2. Abandonment

■ Although the parents were never married, the father acknowledged the child to be his. Under § 22–2–25(A)(1), supra, the father's consent was required. A consent was obtained but was stricken by the trial court becaues of fraud. Section 22–2–27(D), supra. Petitioners assert this ruling was error. It is unnecessary to reach this contention.

Section 22–2–26(A), supra, provides that a consent is not required from a parent who has abandoned the minor to be adopted. The trial court ruled that the father had abandoned the child.

"Abandonment" is not defined in our adoption act. The issue under this point is the meaning of abandonment. Our prior adoption statute did not use the word "abandonment". Decisions under the prior

law refer to or discuss abandonment but do not define the term. *Petition of Quintana,* 83 N.M. 772, 497 P.2d 1404 (1972); *Nevelos v. Railston,* 65 N.M. 250, 335 P.2d 573 (1959). The same is true of "abandonment" as a criminal offense—the statutes and decisions do not define the term. See §§ 40A–6–1 and 40A–6–2, N.M.S.A.1953 (Repl. Vol. 6, Supp.1975); *State v. Seaton,* 75 N.M. 511, 407 P.2d 354 (1965); *State v. Villalpando,* 86 N.M. 193, 521 P.2d 1034 (Ct.App.1974).

*Anonymous v. Anonymous,* 25 Ariz.App. 10, 540 P.2d 741 (1975) states:

"The majority of jurisdictions whose statutes predicate adoption without consent upon abandonment, interpret 'abandonment' as intentional conduct on the part of a parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child."

Although this definition has been widely used, its meaning has been given varying interpretations. The three following cases illustrate this variation.

*W. v. G.,* 34 N.Y.2d 76, 356 N.Y.S.2d 34, 312 N.E.2d 171 (1974) states: "Even where the flame of parental interest is reduced to a flicker the courts may not properly intervene to dissolve the parentage." Under this view, there was no abandonment in *W. v. G.,* supra, because the father's "communications with his children, sporadic and infrequent as they were, evinced that modicum of attention sufficient to defeat petitioners' burden of proving abandonment." This approach has been changed by statute in New York. *Matter of Commissioner of Social Services,* 84 Misc.2d 253, 376 N.Y.S.2d 387 (1975).

*Emmons v. Dinelli,* 235 Ind. 249, 133 N.E.2d 56 (1956) refused to apply the relinquishment part of the above-quoted definition. The court pointed out that the evidence showed a settled purpose to forego parental duties but there was no evidence

of a settled purpose to relinquish parental claims. The court declined to apply an "inflexible doctrine in favor of a parent who denies any 'actual intention' to forego that title or claim to his child, but who at the same time neglects his parental duty to personally care for, support, educate, give moral and spiritual guidance, and provide a home and that love and security which a home provides."

*Sernaker v. Ehrlich,* 86 Nev. 277, 468 P. 2d 5 (1970) refers to intentional conduct which shows a settled purpose to relinquish all parental rights in the child. "Lack of support plus other conduct such as a failure to communicate by letter or telephone, or absence of sending of gifts is sufficient to uphold the trial court's conclusion that a child has been abandoned."

*W. v. G.,* supra, emphasized the relinquishment of parental rights and determined such relinquishment on the basis of the subjective intent of the parent. *Emmons v. Dinelli,* supra, rejected the relinquishment aspect of the above-quoted definition. *Sernaker v. Ehrlich,* supra, applied the quoted definition but determined the required intent on the basis of the objective evidence before the court.

■ The father urges us to adopt the definition quoted in *Anonymous v. Anonymous,* supra, and to apply the subjective intent of the parent in determining whether the evidence meets the definition of abandonment. We decline to do either.

"The subjective intent standard often focuses too much attention on the parent's wishful thoughts and hopes for the child and too little on the more important element of how well the parents have discharged their parental responsibility." *D. M. v. State,* 515 P.2d 1234 (Alaska 1973). We decline to adopt the parents' subjective intent as the evidentiary basis for determining whether abandonment has occurred.

The "settled purpose" definition of abandonment, *Anonymous v. Anonymous,* supra, places the emphasis upon a parent's *intent* rather than upon the *effect* of the parents' conduct upon the child. The result is "to enshrine parental rights at the cost of leaving the child forever in limbo wholly at the mercy of the parents' wavering and fluctuating intent." *Matter of Commissioner of Social Services,* supra. We decline to adopt the "settled purpose" definition of abandonment because of the emphasis upon parental intent rather than parental conduct.

■ The petitioners and H.S.S.D. urge a definition of abandonment that focuses on the effect of the parents' conduct and urge the use of an objective evidentiary basis (as opposed to a parent's subjective intent) in determining whether abandonment has occurred. We agree. We approve the definition of abandonment stated in *D. M. v. State,* supra:

". . . [A]bandonment consists of conduct on the part of the parent which implies a conscious disregard of the obligations owed by a parent to the child, leading to the destruction of the parent-child relationship."

See *Anonymous v. Anonymous,* supra; Compare, *Hendricks v. Curry,* 401 S.W.2d 796 (Tex.S.Ct.1966).

This definition " . . . focuses on two questions—has the parent's conduct evidenced a disregard for his parental obligations, and has that disregard led to the destruction of the parent-child relationship?" *In Re Adoption of A. J. N.,* 525 P.2d 520 (Alaska 1974).

■ "The two elements of the test are interdependent; both must be established if there is to be legal abandonment. The mere fact that there is evidence of the relationship's destruction is of no consequence if it cannot be established that there was parental conduct which caused it." *Adoption of V. M. C.,* 528 P.2d 788 (Alaska 1974).

■ What is meant by "conscious disregard"? "Conscious" is defined in terms of "awareness" or "knowing". *Ford Mo-*

*tor Co. v. Wagoner,* 183 Tenn. 392, 192 S. W.2d 852 (1946); 15 A C.J.S. *Conscious,* p. 571; Webster's Third New International Dictionary, *Conscious,* p. 482 (1966); see *Newsom v. Smiley,* 57 Cal.App.2d 627, 135 P.2d 24 (1943). "Disregard" is defined in terms of "pay no attention to". Webster's Third New International Dictionary, *Disregard* (as a verb), p. 655 (1966); Black's Law Dictionary, *Disregard,* p. 558 (4th Ed. 1951).

A "conscious disregard" is a "knowing failure to pay attention"; "an awareness that one is not paying attention".

What is meant by "obligation owed by a parent to a child"? These obligations are the obligations "too personally care for, support, educate, give moral and spiritual guidance, and provide a home and that love and security which a home provides." *Emmons v. Dinelli,* supra.

A "conscious disregard of the obligations owed by a parent to the child" excludes acts which are beyond the control of the parent. See *S. K. L. v. Smith,* 480 S.W.2d 119 (Mo.Ct.App.1972). The phrase includes acts within the parent's control and thus includes careless or negligent acts. *Emmons v. Dinelli,* supra. No specific intent to disregard parental obligations is involved. The only "intent" involved is the purposely engaging in conduct which implies a conscious disregard of parental obligations. Compare, *Hays v. Hudson,* 85 N.M. 512, 514 P.2d 31 (1973); U.J.I. Crim. 1.50.

Failure to support, or allowing others to assume the burden of support, is a factor tending to establish abandonment, but only when linked with other circumstances. *Nevelos v. Railston,* supra. "The typical kinds of conduct which constitute abandonment are the withholding of parental presence, love, care, filial affection and support and maintenance." *Sernaker v. Ehrlich,* supra.

We agree with the Alaska court that abandonment "is to be determined objectively, taking into account not only the verbal expressions of the natural parents but their conduct as parents as well." *D. M. v. State,* supra.

We disagree with the holding of Alaska courts that the best interests of the child are relevant to the second element of abandonment—the destruction of the parent-child relationship. *In Re Adoption of A. J. N.,* supra; *Adoption of V. M. C.,* supra. *In Re Adoption of A. J. N.,* supra, states that: "it is indicative of a breakdown of the parent-child relationship if the child's best interests are promoted by legal severance of the relation." We do not agree with this statement for two reasons. First, it seems illogical to consider the best interests of the child in *determining* whether there has been a *destruction* of the parent-child relationship because the destruction of that relationship must have been caused by the parent's conduct. Abandonment focuses on parental conduct and not on the child's welfare. Second, *Nevelos v. Railston,* supra, states that the court has no right to consider the merits of an adoption petition "insofar as it concerns the welfare of a child, unless it has in the first instance determined that the consent of a natural parent may be dispensed with." Under *Nevelos,* supra, the best interests of the child are not to be considered unless the court has first determined that abandonment has occurred.

3. Abandonment—Sufficiency of Evidence and Conclusion of Abandonment

This issue is concerned with the sufficiency of the evidence to support the conclusion that the father abandoned the child. The next issue (C(4)) is concerned with the sufficiency of the evidence that it was in the child's best interests that the adoption petition be granted. The quantum of proof for both issues is clear and convincing evidence. *Huey v. Lente,* 85 N.M. 597, 514 P.2d 1093 (1973). As to both of these issues, our function is to

view the evidence in the light most favorable to the prevailing party—the petitioners. So viewing the evidence, we determine if the evidence on these issues were sufficient to establish clearly and convincingly the fact of abandonment, and that adoption was in the best interests of the child. *Duke City Lumber Company, Inc. v. Terrel,* 88 N.M. 299, 540 P.2d 229 (1975).

We have previously pointed out (Part B) that the parents were never married, that the parents lived together only a short period of time prior to the child's birth, that the father moved into the grandfather's home shortly after the birth but moved out before the child was six months old.

The trial court found that the father never contributed financially to the support of the child; that while the father lived with the mother in the grandfather's home, he seldom assumed any responsibility for caring for the child; that after he left the home "he took no responsibility for the care, custody or support of the Child . . . ." The father signed a consent to adoption form. The father discussed the fact that the child had been placed for adoption with the grandfather two weeks later. These events occurred in March, 1975. The father did not move to strike his consent until July 29, 1975. Although the consent was stricken for fraud, the father did not hurry to oppose the adoption petition. The father presently lives with Bernice, to whom he is not married, and Bernice's two children. Bernice and the two children have never met the child. Neither the father nor Bernice desire to have the child placed in their home immediately. The father wants the child placed with the grandfather, with visitation rights in the father, and with permanent custody transferred to the father and Bernice at the end of six months. Yet, the father has feared that the grandfather might try to gain permanent custody for himself if the grandfather obtained temporary custody.

There was evidence to support the above findings. Although there was conflicting evidence, it was for the trial judge, as fact finder, to resolve the conflicts. *Duke City Lumber Company, Inc. v. Terrel,* supra. The appellate issue is whether the evidence was clear and convincing. We hold that it was; that the evidence establishes an almost total absence of a parental relationship between father and child from the time of the child's birth. The evidence was sufficient to establish the father's abandonment.

In contending that the evidence of abandonment was insufficient, the father relies on two findings of the trial court: (1) the finding that Navajo custom confers upon maternal grandparents the status of custodians of the grandchildren; (2) the finding that the father was raised on the reservation, shares the attitude and beliefs common to the Navajo culture, and has not departed from that culture.

The father asserts that he could not have abandoned the child because under Navajo custom, the custodian of the child was in the grandfather. Implicit in this argument is the view that if a Navajo father undertakes no responsibilities toward his child, he cannot have abandoned the child because the maternal grandparents assume those responsibilities. This argument is inconsistent with the father's requested findings of fact. These requested findings asked the trial court to make findings to the effect that the father had affirmatively assumed and carried out parental duties, both as to the child and as to the children of Bernice. In light of the evidence, the trial court properly rejected the father's requested findings.

Abandonment is a question of fact. *Sernaker v. Ehrlich,* supra. The facts establish abandonment. The contention that a Navajo father could not abandon his child because of Navajo custom seems contrary to 7 Navajo Tribal Code § 315(c), which states a Navajo Tribal policy as to adoption of Navajo children where parents have *not* abandoned their children. Our answer to the claim that under Navajo custom the father could not

abandon his child is that this theory was not relied on in the trial court. The father cannot change his theory on appeal. *American Bank of Commerce v. United States Fidelity and Guaranty Company,* 85 N.M. 478, 513 P.2d 1260 (1973).

The father asserts that even though the trial court made various findings on the issue of abandonment, he did not reach the conclusion of abandonment on the basis of those findings. This argument has two aspects: (1) oral remarks of the trial court, and (2) the trial court's conclusions of law.

Relying on certain oral remarks of the trial court from the bench, the father asserts that the trial court relied on the father's delay in taking action to oppose the adoption. The trial court's oral remarks were not a decision in the case. *Specter v. Specter,* supra. The remarks will not be considered.

Conclusion 2 of the trial court dispensed with the father's consent because the father had abandoned the child. Conclusion 25 states that notwithstanding the fraud perpetrated upon the father in connection with his consent to adoption, the father abandoned the child "by failing to take timely steps for the return of his child." The father's argument combines these two conclusions. The father asserts the trial court reached the conclusion of abandonment solely on the basis of delay in taking legal action and that this delay was insufficient to support the conclusion of abandonment.

It is unnecessary to determine whether conclusion 25 is erroneous. Even if it is (which we do not decide), conclusion 25 does not aid the father's position. The numerous findings concerning abandonment show that conclusion 2 was not based solely on delay in taking legal action. A correct result having been reached in conclusion 2, we do not consider conclusion 25. *Tsosie v. Foundation Reserve Insurance Company,* supra. (See B(4)(a) above).

4. Best Interests of the Child—Sufficiency of the Evidence

The trial court concluded that it would not be in the best interests of the child for the child to be placed in the custody of the father. This conclusion is supported by findings showing that the father had abandoned the child and by the finding that the father did not want custody at the time of trial, but wanted the child placed with the grandfather for the next six months.

The trial court concluded that it would not be in the best interests of the child for the child to be placed in the custody of the grandfather. The findings supporting this conclusion were discussed in B(2) of this opinion.

The trial court concluded that petitioners were fit and proper persons to have permanent custody of the child and that the petition for adoption should be granted. The character of the petitioners and their ability to rear the child have not been questioned. The contention is that the evidence does not support the conclusion that petitioners are fit and proper persons to have permanent custody.

The grandfather asserts that the trial court wrongfully relied on the duration of petitioners' custody of the child. The argument seems to imply that this is the only matter on which the trial court relied. The findings concerning the father and grandfather show this to be incorrect.

The father asserts that evidence fails to show that it was in the child's best interests to be placed in the custody of petitioners. The argument views the evidence in the light most favorable to the father and grandfather, an incorrect view. *Duke City Lumber Company, Inc. v. Terrel,* supra. The argument also asserts that the trial court gave too much weight to the mother's evidence whereas the mother was unworthy of belief. Credibility of the witness was for the trial court to decide.

*Duke City Lumber Company, Inc. v. Terrel,* supra.

The Association asserts the trial court disregarded the testimony as to cultural factors and gave undue consideration to the desires of the mother. Neither the findings nor the conclusions of the trial court support the Association's claim. The record and the trial court's decision show a concern for Navajo custom and culture as well as a concern for the best interests of the child. The trial court considered Navajo custom and culture, but on the evidence presented, ruled that in the best interests of the child, the adoption petition should be granted.

Oral argument is unnecessary. The order denying the petition for habeas corpus and the decree of adoption are affirmed.

IT IS SO ORDERED.

HENDLEY and HERNANDEZ, JJ., concur.