657 P.2d 134

**In the Matter of the ADOPTION OF John DOE, a minor.**

No. 5716.

Court of Appeals of New Mexico.

Dec. 9, 1982.

Certiorari Denied Jan. 14, 1983.

Richard M. Snell, Clovis, for appellant.

David F. Richards, Garrett & Richards, Clovis, for petitioners.

Randy Knudson, Doerr & Knudson, Clovis, Guardian ad litem for involved child.

## OPINION

SUTIN, Judge.

The father of a minor child murdered the mother of the child and shot the grandmother. The father appeals an order of the district court that terminated his parental rights. We affirm.

The trial court found that the parents of the child were married on May 3, 1979 (the wife was 17 years old). The child was born January 25, 1980. The parents separated on May 1, 1980. The child and the mother moved into the home of the maternal grandparents on May 14, 1980, and a divorce decree was entered on July 3, 1980. The custody of the child was granted to the mother with reasonable visitation rights in the father together with custody every other weekend. Support payments were $85.00 per month.

On October 30, 1980, after telling the mother by telephone that "the world wasn't big enough for her and him both," the father went to the home of the maternal grandparents and intentionally shot the mother five times in the chest, killing her instantly. (The mother was 18 years old and the child 9 months old.) At the same time and in the same room, he intentionally shot and injured the maternal grandmother. (Finding No. 4—challenged.)

On December 16, 1980, the father was charged with first degree murder, but entered a plea of guilty to second degree murder and aggravated battery with a firearm. He was sentenced to 14 years in the State Penitentiary and fined $15,000.00.

On December 21, 1980, the maternal grandparents were awarded custody of the child. Due to the incarceration of the father, the child has not seen the father since October 30, 1980, the date the mother was murdered, and this condition is unlikely to change or improve. The father's earliest possible release date is in May, 1985, at which time the child will be over 5 years of age. (Finding No. 7—challenged.)

Due to the father's wilful act, the father abandoned the child by reason of neglect in leaving the child without proper parental care and control or subsistence necessary for the child's well-being. Because of his incarceration due to his wilful act, the father placed himself in a position of disability to discharge his responsibilities, all as defined in §§ 32–1–3 and 40–7–4, N.M.S.A. 1978 and these conditions of neglect are unlikely to change in the foreseeable future. (Finding No. 8—challenged.)

The child has been in the maternal grandparents' home since he was less than 4 months old. If it ever existed, the parent-child relationship disintegrated. A psychological parent-child relationship has developed between the child and the maternal grandparents and they desire to adopt the child. (Finding No. 9—challenged.)

The wilful murder of the child's mother by the father constitutes a total neglect of his parental obligations toward the child in that he permanently removed the child's mother who could have provided for the child's needs. The evidence was clear and convincing. (Findings No. 10, 11—challenged.)

The court concluded: (1) it was established by clear and convincing evidence that the father abandoned and neglected the child; that the welfare and interests of the child would be served best by terminating the father's parental rights; (2) the father evidenced intentional conduct which demonstrated a conscious disregard of obligations owed the child which conduct led to the

destruction of the parent-child relationship; (3) the court must give primary consideration to the physical, mental and emotional welfare and needs of the child; the act of the father was palpably hurtful to the child which demonstrated that parental obligations had been forsaken; and (4) the petition for termination of parental rights should be granted.

The father claims the district court erred for two reasons:

(1) The court's findings Nos. 4, 7, 8, 9, 10 and 11 are not supported by clear and convincing evidence and will not support a determination of abandonment, and

(2) The court should have adopted all of the father's tendered requested findings and conclusions.

The father claims that the evidence and the law will not support a determination of abandonment. We disagree.

■ The findings of the court are supported by substantial evidence, clear and convincing. To detail all of the evidence most favorable to the decision is unnecessary. A recitation of the rules which govern the court's findings has been stated innumerable times. We need not repeat them. The father relies upon his testimony and that of his mother. The trial court listened and tested its credibility. It believes or disbelieves this testimony. We do not. Neither do we weigh the testimony.

After the telephone conversation in which the father told the mother "that the world wasn't big enough for her and him both," the father walked 5, 6 or 7 blocks to a friend's home. He walked in. No one was in the home. He found a gun in a dresser drawer, put it in his pants and walked 9 blocks to the grandparents' home where the mother and the child lived. He pounded on the door and wanted to talk to the mother. He entered and grabbed the mother by the arm. The father, mother and child entered the bedroom and the father slammed the door. He shot the mother five times in the heart area which killed her. The grandmother ran to the bedroom, kicked the door open, saw the mother dead and the child at the end of the bed. She thought the father would shoot the child but he squatted, put his gun on his arm, shot the grandmother in the arm and ran out of the house.

■ The father claims the trial court erred because the petition proceeded on the basis of abandonment and not neglect; that "[t]he judge, in an attempt to bolster his gut reaction decision, fished around and brought in Section 32–1–3 * * * not pled which was Section 40–7–4 B(3) * * * and * * * Section 40–7–4B(4) * * * not pled."

Section 40–7–4(B) provides four bases upon which parental rights can be terminated: (1) abandonment; (2) the identity of the parents is unknown; (3) neglect as defined in § 32–1–3; and (4) foster care placement. Subsection E(2) provides that the application shall set forth "the ground for termination and the facts and circumstances supporting the ground for termination." Subsection F provides that "[a]fter the filing of an application to terminate parental rights, the court shall set a time and place for a hearing on the application at least twenty days before the date of the hearing." No provision appears for any other pleadings or proceedings between the time the application is filed and the hearing. Neither does this section forbid intermediate proceedings or pleadings. Petitioners on motion obtained a court order that a guardian ad litem be appointed.

The petition alleged that as grounds for termination, "the minor child has been abandoned by the natural father since October 30, 1980; that the natural father has neither contacted nor contributed to the support of said child since that time."

The father filed no response. The case proceeded to a hearing on whether the father abandoned the child. Evidence was presented by the parties sufficient to show that the father abandoned the child by reason of neglect as defined in § 32–1–3. Section 40–7–4(B) provides:

The court shall terminate parental rights with respect to a minor child when:

(1) the minor has been abandoned by his parents * * * or

\* \* \* \* \* \* \*

(3) the child is a neglected * * * child as defined in Section 32–1–3 NMSA 1978 * * *.

Section 32–1–3(L) says:

"neglected child" means a child:

(1) who has been abandoned by the parent * * *.

*   *   *   *   *   *

(3) whose parent * * * is unable to discharge his responsibilities to and for the child because of incarceration.

"Incarceration" means "imprisonment; confinement in a jail or penitentiary." Black's Law Dictionary 903 (Rev. 4th ed. 1968).

We need not distinguish a "neglected child" from an "abandoned child" because a "neglected child means a child who has been abandoned by the parent," a parent who by reason of incarceration "is unable to discharge his responsibilities to and for the child." "Incarceration" takes on ominous tones in the parent-child relationship, especially so when a father, in the presence of a child, murders the mother of the child. Under this interpretation of § 40–7–4(B), the district court properly terminated the father's parental rights.

*Adoption of Doe,* 89 N.M. 606, 555 P.2d 906 (Ct.App.1976) involved the adoption and custody of a child. It approved a definition of abandonment stated in an Alaska case:

" * * * [A]bandonment consists of conduct on the part of the parent *which implies a conscious disregard of the obligations owed by a parent to the child,* leading to the destruction of the parent-child relationship." [Emphasis added.] [Id. 618, 555 P.2d 906.]

*   *   *   *   *   *

What is meant by "obligation owed by a parent to a child"? These obligations are the obligations "too [sic] personally care for, support, educate, give moral and spiritual guidance, and provide a home and that love and security which a home provides." [Citation omitted.] [Id. 619, 555 P.2d 906.]

*Hutson v. Haggard,* 475 S.W.2d 330, 333 (Tex.Civ.App.1971) said:

[W]e are of the opinion that appellant's wilful criminal acts and course of conduct has been such *as implies a conscious disregard* and indifference to Melissa *in respect to his parental obligations* that he as a parent owed to her. Thus, we reject the contention that imprisonment does not constitute voluntary abandonment * * *. [Emphasis added.]

The same result occurred in other mother and non-mother-murder cases but under different statutes. See, *In re Welfare of Scott,* 309 Minn. 458, 244 N.W.2d 669 (1976); *Matter of B.A.M.,* 290 N.W.2d 498 (S.D. 1980) (abandonment); *In re Sego,* 82 Wash.2d 736, 513 P.2d 831 (1973); *Turner v. Adoption of Turner,* 352 So.2d 957 (Fla.App. 1977) (abandonment under adoption statute); *Adoption of Kurth,* 16 Wash.App. 579, 557 P.2d 349 (1976); *In re Sarah H.,* 106 Cal.App.3d 326, 165 Cal.Rptr. 61 (1980); *In re Abdullah,* 85 Ill.2d 300, 53 Ill.Dec. 246, 423 N.E.2d 915 (1981); *In re Geoffrey G.,* 98 Cal.App.3d 412, 159 Cal.Rptr. 460 (1979); and *Avera v. Rainwater,* 150 Ga.App. 39, 256 S.E.2d 648 (1979); *In re Brannon,* 340 So.2d 654 (La.App.1976) (non-mother murder). For a strong difference of opinion see *Adoption of J.,* 139 N.J.Super. 533, 354 A.2d 662 (1976), reversed, 73 N.J. 68, 372 A.2d 607 (1977).

Sympathy or leniency are not rules of law that protect parental rights of a father who murdered the mother of a child. We agree with *Adoption of J.,* supra [354 A.2d 667]: "It is painfully plain that the father's killing of the mother forever deprives the child of her maternal presence and being—the essence of childhood. A more horrendous wrong to a child is difficult to conceive." The Legislature enacted this concept as a matter of public policy. Section 40–7–4(A) says in pertinent part:

In proceedings to terminate parental rights, the court shall give primary consideration to the physical, mental and emotional welfare and needs of the child.

"Primary consideration" means consideration that stands first in rank, importance or value, fundamental in nature. The

welfare of the child is of the highest importance for the court to consider. In *Interest of F.H.,* 283 N.W.2d 202 (N.D.1979) discusses in detail the parental rights of a prison inmate, abandonment and child welfare. North Dakota adopted the Uniform Juvenile Court Act. It makes no reference to incarceration. It does provide that parental rights may be terminated if the parent has abandoned the child. Omitting citation of authorities, with emphasis added, it said:

We conclude that generally incarceration alone is not a defense to abandonment. Also, and on the other hand, incarceration per se does not constituted [sic] abandonment. Abandonment, however, may rest upon confinement coupled with other factors, *such as parental neglect,* withholding affection, no contact, no support, financial or otherwise, and disregard for the general welfare of the child * * *.

We have said that in adjudicating the issue of parental rights with respect to children, *the primary consideration is the welfare of the child.* Certainly, the child's welfare is the purpose of the proceeding. This is so regardless if the termination proceeding is based on grounds of abandonment. * * * [Id. 213.]

\* \* \* \* \* \*

The rights of parents are not proprietary rights but rather are in the nature of a trust reposed in them, subject to their correlative duty to care for and protect the child. *The law secures their rights only so long as they shall discharge their obligations.* They are not to be enforced to the detriment or destruction of the happiness and well-being of the child * *.

We cannot allow the welfare and happiness of the child in this case to be destroyed in the name of protecting rights which have never been exercised and of which corresponding obligations have never been fulfilled. [Id. 214]

See *Avera v. Rainwater,* supra.

■ Whether "abandonment" has occurred during incarceration is a question of fact to be determined on a case by case

basis. Not every act of a parent which results in incarceration, nor every criminal act perpetrated between parents, can be deemed to be abandonment as a matter of law. Abandonment rests upon incarceration coupled with other factors such as parental neglect, lack of affection shown toward the child, failure to contact the child, financially support the child if able to do so, as well as disregard for the general welfare of the child.

In the instant case, the evidence supports the trial court's findings that the father abandoned his child.

The murder of the mother by the father struck at the heart of the family. The conviction proved the father's inability to appreciate the impact of his actions on the child and to respect the emotional and physical needs of the child.

The trial court gave primary consideration to the welfare of the child. We agree.

■ The father's lawyer seeks an award of attorney fees for services rendered in this appeal.

Rule 27(b) of the Rules of Appellate Procedure in Civil Cases reads:

[T]he appellate court may award attorneys' fees for services rendered on appeal in causes where the award of attorneys' fees is permitted by law * * *.

The father, a pauper, was granted free process in this appeal pursuant to § 39-3-12, N.M.S.A.1978. In the exercise of discretion, we may award attorney fees when "permitted by law." "By law" appears to mean by statute or regulation. See *Casillas v. S.W.I.G.,* 96 N.M. 84, 628 P.2d 329 (Ct. App.1981). The lawyer's briefs filed in this Court and his oral presentation were commendable. But we can find no basis upon which to render an award.

Section 40-7-4(G) provides that:

The court shall, upon request, appoint counsel for any parent who is unable to obtain counsel for financial reasons, or, if in the court's discretion, appointment of counsel is required in the interest of justice.

No request was made of the trial court for appointment as attorney for services to be rendered in this appeal. Whether this section also covers an award of attorney fees for such services is not before us. An attorney fee for the father's lawyer is denied.

AFFIRMED.

IT IS SO ORDERED.

HENDLEY and DONNELLY, JJ., concur.